G.J.T., Inc. *vs.* Boston Licensing Board & others[1]
(and three consolidated cases[2]).

Suffolk.  December 3, 1985 — April 14, 1986.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, & Nolan, JJ.

*Boston. Boston Licensing Board. Public Entertainment. Video Games.
License. Statute,* Construction, General law, Special law. *Words,*
"Licensing authority."

Discussion of the history of various general and special laws relevant to the
licensing of public entertainment in the city of Boston. [288-296]

In response to a reported question of law, this court concluded that, in the
city of Boston, the licensing authority referred to in G. L. c. 140,
§ 177A, is the mayor, and not the Boston Licensing Board, and that
one who, in Boston, offers as entertainment the use of a machine requiring
a license under § 177A must also obtain from the mayor a license under
the entertainment licensing statute, St. 1908, § 494. [297]

In response to reported questions of law, this court concluded that, in the city
of Boston, G. L. c. 140, § 183A, operates to require a license for any
concert, dance, exhibition, cabaret, or other public show held on premises
specified in that section, whether or not an admission fee is charged,
and that, by virtue of St. 1908, § 494, the authority to license those
forms of entertainment comprehended by G. L. c. 140, § 183A, resides
in the mayor and not in the Boston Licensing Board. [297]

---

[1] Members of the Boston Licensing Board, the city of Boston, the mayor
of Boston, and the executive director of the mayor's office of consumer
affairs and licensing.

[2] G.J.T., Inc. *vs.* Chairwoman of the Boston Licensing Board & others
(the mayor of Boston, the executive director of the mayor's office of con-
sumer affairs and licensing, and the police commissioner of Boston); Boston
Licensing Board *vs.* City of Boston & others (the mayor of Boston and the
executive director of the mayor's office of consumer affairs and licensing)
and Richardson Amusement Corp., interpleading plaintiff; First Amend-
ment, Ltd., & others (Liberty Book Shop, Inc., Book Mart, Inc., Fantasy
Book Shop, Inc., Coast Vending, Inc., Anthony Russo, doing business as
Adult House, and Fantasy Theatres, Ltd.) vs. Mayor of Boston & others
(the executive director of the mayor's office of consumer affairs and licensing
and the city of Boston). The Commissioner of Public Safety was designated
a nominal party in three of the consolidated cases.

CIVIL ACTIONS commenced in the Superior Court Department on February 5, 1982, June 16, 1982, and April 6, 1983, respectively.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 2, 1982.

The four cases were heard together in the Superior Court Department by *George N. Hurd, Jr., J.*, and questions of law were reported by him to the Appeals Court. The Supreme Judicial Court granted requests for direct review.

*Regina L. Quinlan* for G.J.T., Inc., & others.

*James Thaddeus McDavitt,* Special Assistant Corporation Counsel (*Virginia Tisei,* Special Assistant Corporation Counsel, with him) for the city of Boston & others.

*Harrison A. Fitch (Jean M. DeLuca* with him) for Boston Licensing Board.

LIACOS, J. These cases bring to the court a dispute pertaining to the authority to license entertainment in the city of Boston. That authority is claimed by the mayor of Boston, through the mayor's office of consumer affairs and licensing, also known as the licensing division (division), on one side, and the Boston Licensing Board (board), a body whose members are appointed by the Governor, on the other.

Before the court are four consolidated cases, variously pitting combinations of the two governmental parties and potential licensees against each other. Cross motions for summary judgment were filed by the board and the division in the Superior Court. The judge issued a memorandum and order and a supplemental memorandum and order in which he granted the board's motion.[3] Parties aggrieved by the judge's orders appealed, and, additionally, the judge reported "the questions of law raised by both defendants' and plaintiff's Motion for Summary Judgment" to the Appeals Court. Mass. R. Civ. P. 64, 365 Mass. 831 (1974). The mayor and the board filed applica-

---

[3] No separate document entitled "Judgment" appears in the joint appendix, but, to the extent some of the matters here are on appeal, we treat the judge's memoranda and orders as final judgments. See Mass. R. Civ. P. 54 (a), 365 Mass. 820 (1974).

tions in this court seeking direct appellate review. Mass. R. A. P. 11, as amended, 378 Mass. 938 (1979). We allowed those motions.

The questions presented for our review may be summarized as follows: (1) By what authority are automatic amusement devices (including electronic and video games) and amusement arcades in Boston licensed? (2) What licensing body in Boston is meant by the term "licensing authorities" in G. L. c. 140, § 183A (1984 ed.), and other related provisions of G. L. c. 140? (3) How does § 183A apply to establishments in Boston? (4) What is the basis, if any, of the entertainment licensing authority of the mayor of Boston?[4] We have reviewed the statutes bearing on these questions. We conclude that the Legislature has delegated the over-all authority for the licensing of entertainment within the city of Boston to the mayor of Boston; the Legislature, however, has given the board authority over a few specifically designated types of entertainment.

---

[4] The multiple parties' prayers for declaratory relief do not present the issues as phrased here. Indeed, the record and briefs submitted by the parties in these cases are as redundant and confusing as the statutory provisions on which they rely for their various claims. Nor are we helped by the absence from the voluminous joint appendix of the division's motion for summary judgment, the document on which the judge granted summary judgment, and on which, in part, he reported the case. We believe, however, that the four questions we state encompass the specific live questions raised by the parties on this record.

We do not reach three constitutional questions:

Plaintiff G.J.T., Inc., sought a declaration that G. L. c. 140, § 177A (1984 ed.), is unconstitutional on its face or as applied. It did not pursue this question in the Superior Court, pending resolution of the dispute between the board and the division. G.J.T., Inc., seeks to have this question remanded in the event the board were held to be the licensing authority under G. L. c. 140, § 177A. In light of our holding, we neither reach the merits of this question nor do we direct that it be considered on remand.

Plaintiff First Amendment, Ltd., sought a declaration that the mayor's fee-setting power was limited by constitutional constraints. The orders of the Superior Court judge did not answer this question, nor have the parties adequately presented it as a live issue here.

The board sought a declaration that St. 1908, c. 494, was unconstitutional because it was vague and violative of due process. The judge of the Superior Court did not address this question, and it has not been pursued by the parties on appeal.

No single entertainment licensing statute comprehends all the categories of entertainment which a Massachusetts customer might enjoy.[5] The various statutes, by their terms, present a patchwork coverage, sometimes apparently overlapping. The parties disagree, not only about the construction of statutes, but also over which statutes are still in effect. We resolve this ambiguity by tracing the history of the relevant statutes, so as to understand the purpose and scope of each.

*1821 Boston charter.* Throughout the early history of Massachusetts, theatrical entertainment was forbidden by a series of Provincial laws. See *Opinion of the Justices,* 247 Mass. 589, 594 (1924). In 1805, the Legislature enacted a statute penalizing the building of a theatre, the leasing of a building for a theatrical performance, and the performance of "any stage play, interlude or other theatrical entertainment" without a license, to be obtained from the Court of General Sessions of the Peace for the county, with the approval of the town selectmen. St. 1805, c. 98. Boston was at that time a town, and theatrical entertainment in Boston was covered by that statute. In 1821, Boston became the first city in the Commonwealth under the provisions of its original charter. St. 1821, c. 110. See *City Council of Boston* v. *Mayor of Boston,* 383 Mass. 716, 719-721 (1981) (describing, in part, history of city charter; statute designated in that opinion as St. 1822, c. 110, is same as one to which we refer as St. 1821, c. 110). Section 14 of c. 110 changed the licensing procedure for entertainment

---

[5] Rather than provide extensive quotations from miscellaneous statutes, we invite the reader to compare, for example, G. L. c. 128A, § 2 (1984 ed.) (race tracks), G. L. c. 140, § 177 (1984 ed.) (billiards and bowling), § 177A (1984 ed.) (automatic amusement devices "including, but not exclusively, such devices as are commonly known as pinball machines"), § 181 (1984 ed.) ("theatrical exhibitions, public shows, public amusements and exhibitions of every description), § 183A (1984 ed.) (concerts, dances, exhibitions, cabarets, or public shows of any description in conjunction with food and drink), § 185I (1984 ed.) (fortune-telling), § 186 (1984 ed.) (skating rinks, carousels, Ferris wheels), and St. 1908, c. 494, § 1 (theatrical exhibitions, public shows, public amusements, and exhibitions of every description in Boston).

in Boston. The mayor and aldermen were given the power "to license all theatrical exhibitions and all public shows, and all exhibitions of whatever name or nature, to which admission is obtained on payment of money, on such terms and conditions as to them may seem just and reasonable." St. 1821, c. 110, § 14.

*Section 181.* Outside Boston, St. 1805, c. 98, remained the law governing theatrical entertainment, until it was repealed by St. 1825, c. 152, § 4, the first section of which granted to the selectmen of each town the same licensing power given to Boston's mayor and aldermen. St. 1825, c. 152, § 1. In 1836, the power of selectmen was codified in Rev. Sts. c. 58, §§ 1-3. In 1849, the Legislature modified the revised statute, adding a prohibition against masked balls, St. 1849, c. 231, § 3, and clarifying the entertainment licensing authority in cities without a special charter provision like Boston's. St. 1849, c. 231, § 1. The statute was recodified in 1860, Gen. Sts. c. 88, § 74; in 1882, Pub. Sts. c. 102, § 115; in 1902, R. L. c. 102, § 172; and in 1921, G. L. c. 140, § 181.

*Division of authority in Boston: St. 1908, c. 494, and G. L. c. 140, § 177.* Meanwhile, the power of the mayor and aldermen of Boston had been transferred to the aldermen alone under Boston's revised charter, St. 1854, c. 448, § 33. In 1878, the Legislature created a board of police commissioners for the city of Boston, to be appointed by the mayor. St. 1878, c. 244, § 1. The city council was given the power to transfer the licensing authority of the aldermen to the board of police commissioners, St. 1878, c. 244, § 2, which they did by Boston Revised Ordinances c. 24, § 3 (1883).[6] Shortly after this ordinance was passed, however, the city council passed an

---

[6] "The said board [of police commissioners] shall have and exercise all the powers conferred by the statutes of the commonwealth and the ordinances of the city upon the board of aldermen or upon the mayor and aldermen, in relation to licensing, regulating, and restraining theatrical exhibitions, public shows, public amusements, billiard tables, bowling-alleys, auctioneers, hawkers and peddlers, carriages, wagons and other vehicles, intelligence offices, itinerant musicians, pawnbrokers, and dealers in second-hand articles and old junk." Boston Revised Ordinances c. 24, § 3 (1883).

amendment revoking the transfer in so far as it included general entertainment licensing by striking the words "theatrical exhibitions, public shows, public amusements" from the ordinance.[7] As a result, the licensing authority for entertainment in Boston was split between the board of aldermen and the board of police commissioners when St. 1885, c. 323, took effect. Chapter 323 replaced the mayor-appointed board of police commissioners with the Boston Board of Police, to be appointed by the Governor. St. 1885, c. 323, § 1. The new board was given all the powers vested in the old board. St. 1885, c. 323, § 2. These powers included licensing of billiard tables and bowling alleys, but not "theatrical exhibitions, public shows, [or] public amusements." The mayor received the licensing authority for the excluded entertainments when he was given the exclusive executive power in Boston under St. 1885, c. 266, §§ 6 and 12.[8]

In 1906, the Boston Board of Police was replaced by the Boston Licensing Board and the Boston police commissioner. St. 1906, c. 291. The licensing board assumed the duties of licensing the sale of alcoholic beverages, innholders, and victuallers in Boston, and licensing of picnic groves, skating rinks, intelligence offices, billiard tables, and bowling alleys. St. 1906, c. 291, § 4. Two years later, the Legislature reaffirmed the mayor's authority to license "theatrical exhibitions, public shows, public amusements and exhibitions of every description" for which an admission fee is charged, but imposed a limitation of $100 for a license fee for entertainment given in a licensed theatre. St. 1908, c. 494, § 1.[9] Arguably, this statute

---

[7] Amendment to Boston Revised Ordinances c. 24, § 3 (1883), passed by the city council January 25, 1883, concurred in by the aldermen January 29, 1883, and approved by the mayor January 30, 1883.

[8] Statute 1885, c. 266, though approved on May 27, 1885, was effective *after* St. 1885, c. 323, approved on June 12, because c. 323 was effective when passed, St. 1885, c. 323, § 9, while c. 266 took effect on June 26, thirty days after its approval. Pub. Sts. c. 3, § 1 (1882).

[9] Statute 1908, c. 494, § 1, provides in pertinent part: "The mayor of Boston . . . shall grant a license for theatrical exhibitions, public shows, public amusements and exhibitions of every description, to which admission is obtained upon payment of money or upon the delivery of any valuable

removed the licensing board's authority over picnic groves, billiard, pool, and sippio tables, bowling alleys, and skating rinks. Whatever the state of licensing for picnic groves, billiard, pool, and sippio tables, bowling alleys, and skating rinks between 1908 and 1920, after 1920 they were under the authority of the board by enactment of St. 1920, c. 191, specifically so providing.[10]

*Section 183A.* Neither G. L. c. 140, § 181,[11] the 1921 recodification of R. L. (1902) c. 102, § 172, which governed licensing of entertainment outside Boston, nor St. 1908, c. 494, which governed licensing of most entertainment in Boston, provided a means to regulate entertainment provided free of charge. This regulatory gap permitted restaurateurs to present entertainment without a license, so long as the patrons were

---

thing, or by a ticket or voucher obtained for money or any valuable thing, upon such terms and conditions as he deems reasonable, but there shall not be charged a fee exceeding one hundred dollars for such license when the entertainment, exhibition or show is given in a building licensed as a theatre."

[10] Statute 1920, c. 191, states: "The mayor and aldermen of a city except Boston, and in Boston the licensing board, and the selectmen of a town, may grant a license to a person to keep a billiard, pool or sippio table or a bowling alley for hire, gain or reward, upon such terms and conditions as they deem proper, to be used for amusement merely but not for the purpose of gaming for money or other property, subject to the provisions of sections one hundred and eighty-six to one hundred and eighty-nine, inclusive, and may suspend or revoke it at pleasure." This section is now G. L. c. 140, § 177.

[11] General Laws c. 140, § 181 (1921 ed.), provided in pertinent part: "The mayor or selectmen may . . . grant, upon such terms and conditions as they deem reasonable, a license for theatrical exhibitions, public shows, public amusements and exhibitions of every description, to be held upon week days only, to which admission is obtained upon payment of money or upon the delivery of any valuable thing, or by a ticket or voucher obtained for money or any valuable thing, or in which, after free admission, amusement is furnished upon a deposit of money in a coin controlled apparatus; and the mayor or selectmen may revoke or suspend such license at their pleasure."

The division has argued that both G. L. c. 140, § 181, and St. 1908, c. 494 (note 9, *supra*), although not identical, give licensing powers to the mayor of Boston for many of the same kinds of amusement and entertainment activity.

charged only for the food and not for the entertainment. In 1926, Mayor James Michael Curley, 1926 House Doc. No. 270, and Governor Alvan T. Fuller, 1926 Senate Doc. No. 1, both sought statutory change. The Legislature responded by enacting St. 1926, c. 299,[12] providing for the licensing of "a concert, dance, exhibition, cabaret, or public show of any description" at which food or drink were sold or a cover charge made.

By the terms of G. L. c. 140, § 183A, inserted by St. 1926, c. 299, the license was to be obtained from "the licensing authorities," and under § 182, amended by c. 299, no penalty was to be imposed on a person holding a § 183A license for not obtaining, in addition, a § 181 license.[13] The potential

---

[12] Statute 1926, c. 299, provides, in pertinent part:

"SECTION 1. Chapter one hundred and forty of the General Laws is hereby amended by inserting after section one hundred and eighty-three the three following new sections:

"*Section 183A.* No innholder, common victualler or person owning, managing or controlling a cafe, restaurant or other eating or drinking establishment shall, as a part of his usual business, offer to view, set up, set on foot, maintain or carry on a concert, dance, exhibition, cabaret or public show of any description at which food or drink or other refreshment is sold for cash, or in connection with which, after free admission, music or other amusement is provided or furnished upon payment or deposit of money, either as a cover charge or in payment for food, drink or other refreshment, unless and until a license therefor, to be exercised on week days only, has been issued by the licensing authorities, who may upon written application and upon such terms and conditions as they may prescribe, grant such a license for any or all of the purposes hereinbefore described and may, after written notice to the licensee, suspend or, after hearing revoke the same.

"SECTION 2. Section one hundred and eighty-two of said chapter one hundred and forty is hereby amended by adding at the end thereof the following: —, or to enterprises required to be licensed under section one hundred and eighty-three A, — so as to read as follows: — *Section 182.* Whoever offers to view, sets up, sets on foot, maintains, carries on, publishes or otherwise assists in or promotes any such exhibition, show or amusement without such license shall be punished by a fine of not more than five hundred dollars. This and [section 181] shall not apply to . . . enterprises required to be licensed under section one hundred and eighty-three A."

[13] General Laws c. 140, § 182, provided for a $500 fine for those providing unlicensed entertainment requiring a § 181 license, while § 183C imposed a fine of up to $1,000 and imprisonment for up to one year. St. 1926, c. 299. See note 12, *supra.*

"licensing authorities" in Boston included the board, whose duties included licensing of victuallers, innholders, and a few specified forms of entertainment, see St. 1906, c. 291, § 4, and the mayor, who licensed theatrical exhibitions and public shows of every description to which admission was charged. St. 1908, c. 494, § 1.

"The familiar rule of statutory construction requires us to interpret a law so as to effectuate the intent of the Legislature in enacting it. *Hanlon* v. *Rollins,* 286 Mass. 444, 447 (1934)." *International Org. of Masters* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 392 Mass. 811, 813 (1984); *Interstate Eng'g Corp.* v. *Fitchburg,* 367 Mass. 751, 757 (1975) (statute must be construed in light of objectives served by its enactment). Additionally, "[t]o the extent possible, local statutes and statutes of general application should be construed together so as to constitute a harmonious whole consistent with the legislative purposes of both." *School Comm. of Boston* v. *Boston,* 383 Mass. 693, 701 (1981). Considering the gap being filled by St. 1926, c. 299 (now G. L. c. 140, § 183A), it is apparent that the authority appropriate to issue licenses under the 1926 statute is the mayor. Had an innholder or victualler charged admission for entertainment presented in his establishment, the mayor would have had the authority to license the entertainment under St. 1908, c. 494. It was the gap in the mayor's authority — not the board's — that the Legislature filled.

In *Venuti* v. *Riordan,* 521 F. Supp. 1027, 1031 (D. Mass. 1981), a Federal District Court judge ruled that G. L. c. 140, § 183A, as amended through St. 1936, c. 71, was unconstitutionally vague and overbroad. The Legislature responded by passing St. 1981, c. 694,[14] a new version of § 183A, designed

---

[14] Statute 1981, c. 694, § 1, provides, in pertinent part: "No innholder, common victualler, keeper of a tavern, or person owning, managing, or controlling any club, restaurant or other establishment required to be licensed under section twelve of chapter one hundred and thirty-eight or under section two, twenty-one A or twenty-one E of chapter one hundred and forty, and no person owning, managing, or controlling any concert, dance, exhibition,

to meet the objections of the Federal court. The 1981 (current) version of the statute omits the language differentiating entertainment offered without charge from that offered for a fee, the difference that required passage of the 1926 statute. The 1981 statute thus expanded the coverage of § 183A, but did not grant any additional power to the licensing authorities, nor did it reassign the licensing power.

*Section 177A.* In *Commonwealth* v. *Rivers,* 323 Mass. 379, 383 (1948), we held the operation of coin-activated amusement devices delivering "free plays" to be gambling within the meaning of G. L. (Ter. Ed.) c. 271, § 7. Consequently, the Legislature enacted St. 1949, c. 361,[15] codified as G. L. c. 140, § 177A, "for the purpose of permitting the use and maintenance of automatic amusement devices such as pinball machines, including 'free play' pinball machines, if duly licensed and if used for amusement only." *Commonwealth* v. *Macomber,* 333 Mass. 298, 301 (1955). Before § 177A made legal the use and maintenance of these devices, they, of course, could not be

---

cabaret or public show of any description to be conducted on any premises required to be licensed under the sections described above, shall, as a part of its usual business, offer to view, set up, set on foot, maintain or carry on a concert, dance exhibition, cabaret or public show of any description, unless and until a license therefor has been issued by the licensing authorities."

[15] Statute 1949, c. 361, provides, in pertinent part: "(1) The licensing authorities of any city or town may grant, and after written notice to the licensee, suspend or revoke a license to keep and operate an automatic amusement device for hire, gain or reward, approved by the director of standards and necessaries of life under section two hundred and eighty-three of chapter ninety-four. (2) The term 'automatic amusement device' as used in this section shall be construed as meaning any mechanism whereby, upon the deposit therein of a coin or token, any apparatus is released or set in motion or put in a position where it may be set in motion for the purpose of playing any game involving, in whole or in part, the skill of the player, including, but not exclusively, such devices as are commonly known as pinball machines including free play pinball machines. . . . (6) No person keeping or offering for operation or allowing to be kept or offered for operation any automatic amusement device licensed under this section shall permit the same to be used for the purpose of gambling. (7) The provisions of section seven of chapter two hundred and seventy-one of the General Laws shall not apply to machines licensed under the provisions of this section."

offered legally for public amusement or entertainment, and no license under G. L. c. 140, § 181, or St. 1908, c. 494, could legalize their use. The Legislature, by enacting St. 1949, c. 361, made exempt from the gambling statute machines licensed under § 177A. A license issued by "[t]he licensing authorities" under § 177A does not authorize the holder to offer entertainment to the public. It simply provides that use of the licensed machine shall not be a violation of the gambling statute. See *Marshfield Family Skateland, Inc.* v. *Marshfield,* 389 Mass. 436, 441, appeal dismissed, 464 U.S. 987 (1983).

The term "licensing authorities," without specific reference, refers to those authorities generally charged with amusement licensing, not to those charged with licensing a narrow and specific class of entertainments. Therefore, in Boston, that term, as used in St. 1949, c. 361, § 1, referred to the mayor, not the board. We perceive no other intended meaning in G. L. c. 140, § 1.[16]

---

[16] The board relies on the definition in G. L. c. 140, § 1, as its major source of power to license amusements and automatic amusement devices. General Laws c. 140, § 1, states: "'Licensing authorities, as used in this chapter, unless a contrary meaning is required by the context, shall mean the boards in Boston and other cities which by special statutes or city charters have the power to issue licenses for innholders or common victuallers, licensing boards appointed under section four of chapter one hundred and thirty-eight in cities which at the municipal election next preceding the first day of January, nineteen hundred and twenty-five, voted to authorize the granting of licenses for the sale of certain non-intoxicating beverages and also in cities wherein by special statutes said boards are vested with all the powers and duties exercised by licensing boards in cities that vote to grant such licenses, the aldermen in all other cities and the selectmen in towns."

In our view, the phrase "licensing authorities" in Boston is a phrase varied in meaning in light of the extensive history (of which we have only recounted a part) of divided licensing authority in the city of Boston. The Legislature seemed aware of this when it provided the exception "unless a contrary meaning is required by the context." We view the statute in context mindful of the principles that "absent a clear legislative intent to the contrary the provisions of a special charter generally prevail over conflicting provisions of a subsequently enacted general law," and that a "sharp conflict between the local and State legislation is required before the local regulation will be held invalid." *School Comm. of Boston* v. *Boston, supra* at 700-701. We see no "sharp conflict" when these statutes are read in proper historical perspective.

In *1001 Plays, Inc.* v. *Mayor of Boston,* 387 Mass. 879, 884 (1983), we declined to address the perceived conflict between § 177A and the general entertainment licensing statute,[17] noting that "licenses may be required under either or both." *Id.* Our analysis today demonstrates that one who offers as entertainment or amusement the use of a machine requiring a license under § 177A[18] must obtain a license under the entertainment-licensing statute as well, i.e., in Boston, St. 1908, c. 494. The division has the authority to issue such licenses under both statutes.

*Mayor's fee-setting authority.* One other statute affecting the power of the mayor should be examined. In 1949, the Legislature provided that Boston, by ordinance, might set fees for licenses. St. 1949, c. 222. Certain licenses were excluded from this procedure. Among those excluded were "licenses granted under chapter four hundred and ninety-four of the acts of nineteen hundred and eight." St. 1949, c. 222, § 1. Fees for c. 494 licenses were to be set by the mayor as one of the "terms and conditions as he deems reasonable," St. 1908, c. 494, § 1, with the $100 limitation on entertainment provided in a licensed theatre. *Id.* The mayor therefore retains his fee-setting authority under the 1908 statute.

---

[17] The parties in *1001 Plays, Inc.* v. *Mayor of Boston, supra,* did not raise the question of the source of the mayor's general entertainment-licensing authority. That question has been raised for the first time in this case. We did not address the parties' assumption in *1001 Plays* that G. L. c. 140, § 181, was the applicable statute. Nor need we address that assumption today.

[18] The applicability of G. L. c. 140, § 177A (1984 ed.), to video games has not been adjudicated conclusively before today. We have upheld against constitutional challenge video game licensing under § 177A, *Caswell* v. *Licensing Comm'n for Brockton,* 387 Mass. 864 (1983), and, as noted *supra,* we declined to address the issue in *1001 Plays, Inc.* v. *Mayor of Boston, supra* at 884.

Plaintiff G.J.T., Inc., makes a cursory reference to the question, but does not pursue it, and other parties apparently have assumed the statute's applicability to video games. With nothing before us calling for a contrary reading, we likewise assume that G. L. c. 140, § 177A, applies to video game machines.

*Conclusion.* We return to the questions raised in this case. (1) Video games and video game arcades are public amusements. In Boston, public amusements are licensed by the mayor, under St. 1908, c. 494. We assume, without deciding, see *supra* note 18, that the use of a video game machine offering free plays would be gambling if the machine were not licensed under G. L. c. 140, § 177A (1984 ed.). In Boston, the licensing authority under § 177A is the mayor. (2) The "licensing authority" in Boston for the purposes of G. L. c. 140, § 183A (1984 ed.), is the mayor. (3) Section 183A requires a license for any concert, dance, exhibition, cabaret, or public show to be held on the premises specified in that section, whether or not an admission fee is charged. (4) The mayor is empowered generally to license entertainment by St. 1908, c. 494, reaffirming the authority stemming from the 1821 charter. Except for references specifically to other officials, a reference to entertainment "licensing authority" in Boston is a reference to the mayor.

The order and supplemental order of the Superior Court are vacated. The cases are remanded to the Superior Court for entry of judgment declaring the rights of the parties in a manner consistent with this opinion.

*So ordered.*