GTE PRODUCTS CORPORATION *vs.* JEFFERSON DAVIS
STEWART, THIRD; DEAN T. LANGFORD & others,[1]
defendants-in-counterclaim.

Essex. May 3, 1995. - August 1, 1995.

Present: ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Employment,* Constructive discharge. *Contract,* Employment. *Public Pol-
icy. Attorney at Law,* In-house counsel.

Discussion of out-of-State cases considering whether an attorney employed
as in-house counsel to a corporation is barred from maintaining any
action for wrongful discharge. [26-29]
This court concluded that an in-house attorney should be permitted to pur-
sue a claim for wrongful discharge against the attorney's corporate em-
ployer in the narrow circumstances where the claim is founded on alle-
gations that the employer's demands would have required violation of
statutory or ethical rules, embodying important public policy, and
where the claim can be proved without violation of client confidences
and secrets. [29-32]
Discussion of State and Federal cases addressing the elements for proof of
constructive discharge. [34-35]
In an action for wrongful discharge in which there was no claim of formal
termination, summary judgment was correctly entered for the employer
where the employee did not demonstrate that he could prove he was
constructively discharged by being forced to work under conditions so
intolerable that a reasonable person would have felt compelled to re-
sign. [32-34, 35-36]

CIVIL ACTION commenced in the Superior Court Depart-
ment on October 16, 1991.

A motion for summary judgment was heard by *John P.
Forte,* J., sitting under statutory authority.

The Supreme Judicial Court granted an application for di-
rect appellate review.

---

[1]Earl E. Lawson and Rolfe D. Trevisan.

*Arthur G. Telegen* for the plaintiff.

*Earle C. Cooley* (*Paul F. Beckwith* with him) for Jefferson Davis Stewart, III.

GREANEY, J. We granted the defendant's application for direct appellate review in this case to decide whether summary judgment was properly granted to GTE Products Corporation (GTE), and individual officers and officials of the company on counterclaims brought by Jefferson Davis Stewart, III, a former in-house counsel for the lighting companies of GTE. Stewart's counterclaims were raised in his answer to an action brought by GTE seeking the return of documents, papers, and other materials taken or retained by Stewart when he left GTE's employment. (Some of the background of the case is reported in the appeal concerning GTE's seeking injunctive relief and damages, 414 Mass. 721 [1993].) The counterclaims were based on the assertion by Stewart that he had been wrongfully discharged in retaliation for his continual attempts to convince GTE management to warn the public about safety risks associated with the use of certain GTE products, and his insistence that GTE comply with Federal law governing the disposal of hazardous waste.[2] We conclude that summary judgment properly was ordered in

---

[2]Stewart's answer stated four counterclaims. The first was for wrongful discharge in retaliation for legal advice given by Stewart to GTE; the second was for breach of the implied covenant of good faith and fair dealing in the employment relationship between himself and GTE; the third was for conspiracy to commit wrongful discharge; and the fourth was for intentional infliction of emotional distress. The judge's order allowed summary judgment as to all claims in favor of all the defendants-in-counterclaim. The parties have focused exclusively on Stewart's claim for wrongful discharge. We conclude, as it appears the parties have, that all of the claims depend on whether Stewart was wrongfully discharged by GTE, and, accordingly, a decision on that claim in favor of GTE resolves the other three counterclaims. Stewart makes no argument to the contrary.

We also note that Stewart has not appealed from the judge's order that he return all copies of documents, papers, and other materials to GTE, as well as copies of his work product, and that he be enjoined from disclosing confidential information learned in the course of his employment with GTE.

favor of GTE and the remaining defendants in counterclaim, and we direct the entry of an appropriate judgment.[3]

The facts, stated in the light most favorable to Stewart based on the materials in the summary judgment record, see *Alioto* v. *Marnell*, 402 Mass. 36, 37 (1988), are as follows.

Stewart began working for GTE in March, 1980, as an attorney in GTE's electrical equipment group. In 1986, he was named general counsel to GTE's lighting businesses, which included U.S. Lighting and Sylvania Lighting. In his capacity as general counsel, Stewart wrote a series of communications to corporate officers and officials concerning safety and liability issues related to three products manufactured by GTE's lighting businesses.[4] In these communications, he advocated that the company take aggressive and (presumably) costly measures to protect consumer safety and guard against possible corporate liability. In addition, when new Federal regulations on the disposal of hazardous waste were adopted, he advised GTE that a subsidiary of the company which provided lighting maintenance services would have to take the costly step of treating fluorescent and incandescent light bulbs as hazardous waste for purposes of

---

[3]No judgment has entered in this case. The appeal was taken from the orders contained in the judge's memorandum of decision on the motion for summary judgment filed by GTE on its behalf and on behalf of the other defendants-in-counterclaim. The parties appear to have treated the orders as a final judgment. We shall deal with the merits of the matter. See *Flood* v. *Midland Nat'l Life Ins. Co.*, 419 Mass. 176, 177 n.1 (1994); *G.J.T., Inc.* v. *Boston Licensing Bd.*, 397 Mass. 285, 286 n.3 (1986).

[4]Stewart retained copies of certain documents, papers, and materials after he left GTE's employment. Descriptions of the products at issue, and legal advice given concerning them, are contained in memoranda, some written by Stewart and some by outside counsel. Copies of some of these documents were attached to Stewart's opposition to GTE's motion for summary judgment. Among the attachments are copies of documents marked "privileged and confidential." GTE has not waived its attorney-client privilege against disclosure of the material retained by Stewart. At GTE's request, and by order of a judge in the Superior Court, "the action has proceeded under seal." *GTE Prods. Corp.* v. *Stewart*, 414 Mass. 721, 723 (1993). Our recitation of the facts respects GTE's interest in the confidentiality of what is undoubtedly privileged material.

disposal.[5] Stewart asserts that his advice was disregarded on some occasions and generally was not well received.

Stewart's immediate supervisor was Rolfe Trevisan, general counsel for GTE. Trevisan had consistently given Stewart high annual performance ratings, raised his salary each year, and recommended that he receive substantial bonuses. A few months before Stewart left the company, Trevisan told Stewart that his performance was "above expectations" and gave him a good rating, a raise and a bonus of over $30,000. At some point during 1991, however, Trevisan lowered Stewart's confidential promotability rating on the law department's executive continuity charts from "promotable immediately" to the lowest promotability rating of "not promotable for three to five years."[6]

According to Stewart, it became clear to him that he was being "squeezed out" of the company after a meeting he had with Trevisan on August 7, 1991. Trevisan told him that Earl Lawson, a corporate officer and manager, had become dissatisfied with Stewart's domineering and "confrontational" style and that Stewart was going to have to learn to get along with Lawson or his future with GTE would be at risk; that Stewart should stop being the "social conscience" of the company; and that Trevisan intended to develop a set of performance objectives to "rehabilitate" Stewart as a productive member of the law department. Based on his experience advising the company on how to terminate employees, Stewart believed that Trevisan's actions likely were intended as a precursor to discharge. Concluding that he would have to abandon unpopular but (in his opinion) legally sound positions were he to remain, Stewart resigned from his employ-

[5]Stewart has admitted that he has no evidence that GTE has not complied with applicable Federal regulations governing the disposal of hazardous waste. He appears to take credit, in fact, for designing a program to bring the company into compliance with the newly adopted regulations. He nonetheless suggests that his advice in this regard was held against him.

[6]Trevisan did not inform Stewart that his confidential promotability rating had been changed. Stewart learned this information from Trevisan's secretary.

ment with GTE on August 8, 1991. After Stewart left, Trevisan tried unsuccessfully to persuade him to return.

1. As a threshold question, we must decide whether Stewart's status as an attorney and in-house counsel for GTE should bar him from maintaining any action for wrongful discharge. As a general rule, an employee at will (Stewart was employed at will) may be terminated by an employer, without notice, "for almost any reason or for no reason at all." *Jackson* v. *Action for Boston Community Dev., Inc.*, 403 Mass. 8, 9 (1988). In company with a majority of other jurisdictions, however, this court has recognized that an at-will employee may sue a former employer for wrongful discharge when that discharge can be shown to be in violation of a clearly defined public policy.[7] "Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149-150 (1989). In limited circumstances, we also have permitted redress "for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed." *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 810-811 (1991) (employee terminated for cooperating with criminal investigation of employer permitted to sue for retaliatory discharge). It has been suggested that a "whistleblower" might be entitled to protection on this basis. See *id.* at 811 n.3.

Courts in jurisdictions which generally recognize an employee's action for wrongful or retaliatory discharge have, however, differed on the question whether an attorney, employed as in-house counsel, should be permitted the same right to sue for wrongful discharge as that enjoyed by other

---

[7]At a recent count, forty-three jurisdictions had recognized the public policy exception to the general rule allowing unrestricted termination of at-will employment. See Note, In-House Counsel's Right to Sue for Retaliatory Discharge, 92 Colum. L. Rev. 389, 394 n.22 (1992).

corporate employees. In *Balla* v. *Gambro, Inc.*, 145 Ill. 2d 492, 501 (1991), the Supreme Court of Illinois concluded "that, generally, in-house counsel do not have a claim . . . of retaliatory discharge."[8] The court based its decision on the destructive impact recognition of the claim would have on the attorney-client relationship that exists between an employer and in-house counsel, *id.*, and on its conclusion that the policy of preserving public health and safety, the basis for recognizing an employee's wrongful discharge claim, is protected adequately without recognition of the claim by the attorney's obligations under the Illinois Rules of Professional Conduct to attempt to prevent his employer from committing an illegal or harmful act and to withdraw from employment if he is requested to engage in conduct that would violate those obligations. *Id.* at 501-502, 504. It has also been noted that ethical canons and disciplinary rules give to a client the unfettered right to discharge an attorney in whom the client has lost confidence, and it has been reasoned that this precept should apply with full force to an attorney employed as in-house counsel. See *Willy* v. *Coastal Corp*, 647 F. Supp. 116, 118 (S.D. Tex. 1986) (applying Texas law), rev'd on other grounds, 855 F.2d 1160 (5th Cir. 1988), aff'd, 503 U.S. 131 (1992). See also *Herbster* v. *North Am. Co. for Life & Health Ins.*, 150 Ill. App. 3d 21, 28-30 (1986), cert. denied, 484 U.S. 850 (1987).[9] The judge granted GTE's mo-

---

[8] The defendant company in *Ball* v. *Gambro, Inc.*, 145 Ill. 2d 492 (1991), was a distributor of kidney dialysis equipment. The attorney whose claim was considered in that case alleged that he had been fired in retaliation for informing the president of the company that he, the attorney, would do whatever necessary to stop the company's sale of dialyzers not in compliance with regulations of the United States Food and Drug Administration and posing a hazard to persons treated with the machines. *Id.* at 496-497.

[9] The objection voiced in these decisions to the continuation of an attorney-client relationship no longer desired by the employer might be viewed as relevant mainly to the scope of the remedy available to in-house counsel who claims to have been wrongfully discharged. A successful claimant in this situation might be limited to the remedy of compensatory damages, and not entitled to seek reinstatement as legal counsel to an employer with whom his relations might be strained. See *General Dynamics Corp.* v.

tion for summary judgment largely on the basis of the reasoning in these decisions.

In contrast, in the case of *General Dynamics Corp.* v. *Rose*, 7 Cal. 4th 1164 (1994), decided after the judge in this case ruled on GTE's motion for summary judgment, the Supreme Court of California concluded that there were sound reasons for recognizing the right of in-house counsel to sue for wrongful discharge in certain limited situations. The court noted that a claim of wrongful discharge protects more than the private interests in job security and professional reputation of the claimant. Protection of the policy expressed in the statute or rule claimed to have been violated by the employer is equally at stake, and the claimant's status as an attorney does not diminish the public interest in the furtherance of that policy. *Id.* at 1181.

In the view of the Supreme Court of California, certain mandatory obligations and prohibitions in the ethical rules of California governing an attorney's professional conduct embody "by their nature and goals . . . important values affecting the public interest at large." *Id.* at 1181-1182. The court observed that "[a]mong other strictures on their conduct, [attorneys] may not be a party to the commission of a crime, destroy evidence or suborn perjury." *Id.* at 1186. Thus, "[t]he case for shielding the in-house attorney . . . from retaliation by the employer for either insisting on adhering to mandatory ethical norms of the profession or for refusing to violate them is . . . clear," *id.* at 1182, and in-house counsel should be permitted to pursue a claim for wrongful discharge if the claim is "founded on allegations that an in-house attorney was terminated for refusing to violate a mandatory ethical duty embodied in [California's code of professional conduct]." *Id.* at 1188.

In addition, the court reasoned, in-house counsel should be permitted to pursue a claim in the "limited circumstances in

*Rose*, 7 Cal. 4th 1164, 1176-1177 (1994) (in-house counsel may pursue wrongful discharge claim but judgment ordering reinstatement is not an available remedy).

which in-house counsel's nonattorney colleagues would be permitted to pursue a [wrongful] discharge claim *and* governing professional rules or statutes expressly remove the requirement of attorney confidentiality" (emphasis in original). *Id.* The court pointed out, however, that instances in which disclosure of client confidences is permissible are rare, and emphasized that it would not condone any dilution of the obligation of secrecy in the context of the attorney-client relationship between a corporate employer and in-house counsel.

We find the latter approach more persuasive. We would be reluctant to conclude that an employee, solely by reason of his or her status as an attorney, must be denied all protection from wrongful discharge arising from the performance of an action compelled by a clearly defined public policy of the Commonwealth. As was pointed out in a treatise critical of the decision in the *Balla* case, "[i]t is clear that there would have been a right of action had the employee not been a lawyer. It thus seems bizarre that a lawyer employee, who has affirmative duties concerning the administration of justice, should be denied redress for discharge resulting from trying to carry out those very duties" (footnote omitted). 1 G.C. Hazard & W.W. Hodes, Law of Lawyering § 1.16:206, at 477 (Supp. 1994). We agree with the Supreme Court of California that public interest is better served if in-house counsel's resolve to comply with ethical and statutorily mandated duties is strengthened by providing judicial recourse when an employer's demands are in direct and unequivocal conflict with those duties. See *General Dynamics Corp.* v. *Rose, supra* at 1188. We stress, however, that a claim for wrongful discharge brought by in-house counsel will be recognized only in narrow and carefully delineated circumstances. To the extent that in-house counsel's claim depends on an assertion that compliance with the demands of the employer would have required the attorney to violate duties imposed by a statute or the disciplinary rules governing the practice

of law in the Commonwealth,[10] that claim will only be recognized if it depends on (1) explicit and unequivocal statutory or ethical norms (2) which embody policies of importance to the public at large in the circumstances of the particular case, and (3) the claim can be proved without any violation of the attorney's obligation to respect client confidences and secrets. See S.J.C. Rule 3:07, Canon 4, DR 4-101 (A) and (B), as appearing in 382 Mass. 778 (1981).[11]

---

[10]This court has, in the past, expressed doubt concerning whether "the ethical code of a private professional organization can be a source of recognized public policy." *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 473 (1992). The point was not resolved in the *Wright* case because the code of ethics by which the plaintiff claimed to be governed had not been introduced in evidence.

We need not decide to what extent we would recognize an explicit command in an ethical code other than the disciplinary rules governing the practice of law in the Commonwealth as a source of recognized public policy. Among other obligations, an attorney engaged in the practice of law in the Commonwealth, may not "[c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (7), as appearing in 382 Mass. 785 (1981). An attorney may not knowingly participate in a fraud on a tribunal, and must, to the extent permitted by his obligation to guard his client's confidences, disclose the occurrence of the fraud. See S.J.C. Rule 3:07, Canon 4, as appearing in 382 Mass. 778 (1981); S.J.C. Rule 3:07, Canon 7, DR 7-101 (B), as appearing in 382 Mass. 784 (1981). An attorney also has a right to reveal client confidences and secrets indicating that a client intends to commit a crime, and the information necessary to prevent commission of that crime. See S.J.C. Rule 3:07, DR 4-101 (C) (3). In view of the inherent ability of a legal practitioner to affect the resolution of controversies affecting private parties and the public good, an attorney's discharge for compliance with these precepts at least, may, in appropriate circumstances, give rise to a claim for wrongful discharge.

[11]The present disciplinary rule governing an attorney's obligation to keep client confidences provides as follows:

"DR 4-101. Preservation of Confidences and Secrets of a Client.

"(A) 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely detrimental to the client.

"(B) Except when permitted under DR 4-101(C), a lawyer shall not knowingly: (1) Reveal a confidence or secret of his client. (2) Use a confidence or secret of his client to the disadvantage of the client. (3) Use a confidence or secret of his client for the advantage

"Except in those rare instances when disclosure is explicitly permitted . . . [by the disciplinary rules governing the practice of law in the Commonwealth], it is never the business of the lawyer to disclose publicly the secrets of the client." *General Dynamics Corp.* v. *Rose, supra* at 1190. The exceptions to an attorney's obligation to guard client confidences under S.J.C. Rule 3:07, Canon 4, DR 4-101 (C), as appearing in 382 Mass. 778 (1981), are extremely limited.[12]

---

of himself or of a third person unless the client consents after full disclosure."

[12]The present disciplinary rule explaining the circumstances in which an attorney may disclose client confidences permits disclosure in only four situations:

"A lawyer may reveal:

"(1) Confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.

"(2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.

"(3) The intention of his client to commit a crime and the information necessary to prevent the crime.

"(4) Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct."

S.J.C. Rule 3:07, DR 4-101 (C). In addition, as was previously noted, see note 10, *supra*, an attorney must, to the extent permitted by the obligation to preserve client confidences, reveal information concerning a fraud committed by a client in the course of the attorney's representation.

Adoption of a modified version of the American Bar Association's Model Rules of Professional Conduct is currently under consideration by this court. Those rules would appear to permit disclosure of client confidences in some circumstances in which disclosure is forbidden as unethical under the present disciplinary rules, and might, therefore, affect the ability of in-house counsel to prove a claim of wrongful discharge.

The text of Rule 1.6 of the Proposed Massachusetts Rules of Professional Conduct, the proposed new rule on disclosure of client confidences, is as follows:

"(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

"(b) A lawyer may reveal such information:

"(1) with the consent of the client or clients affected, but only after

While confidentiality concerns may to some degree be ameliorated by a trial court's use of protective orders and other protective devices, the circumstances in which in-house counsel may pursue a claim for wrongful discharge will, of necessity, be limited by the broad obligation to guard client confidences. See G.M. Tuoni, Massachusetts Attorney Conduct Manual § 4-12 (1992) (discussing breadth of definition of client confidences). Similarly, if the claim for wrongful discharge is one that might be brought by a nonattorney colleague, based on the public policy exception as delineated in the *Smith-Pfeffer* and *Flesner* cases, it must be established that the claim can be proved without any violation of the attorney's obligation to respect client confidences and secrets.

2. Having concluded that we shall, in limited circumstances, recognize the right of in-house counsel to bring suit for wrongful discharge, we turn to whether summary judgment was, nonetheless, properly granted. GTE, as the moving party, having met its initial burden of demonstrating by indicia of admissible evidence, see Mass. R. Civ. P. 56 (b) and (c), 365 Mass. 824 (1974), that Stewart cannot prevail, we inquire whether Stewart has established that there exists a genuine dispute as to essential factual elements of his claim. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711, 716 (1991).

---

a full disclosure to them.

"(2) when permitted under these rules or required by law or court order.

"(3) to the extent that the lawyer believes necessary to prevent the commission of a crime.

"(4) to the extent the lawyer believes necessary to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

"(5) to the extent the lawyer believes necessary to rectify client fraud in which the lawyer's services had been used, except as provided in Rule 3.3(e) [governing criminal defense counsel's obligations with respect to false client testimony]."

Stewart maintains that officials at GTE plotted his dismissal in retaliation for the tenor of the legal advice he offered with respect to product safety in three specific instances, and for advising the company that it must comply with Federal regulations despite the cost entailed by compliance. For the most part, Stewart's claims appear to rest on his advice relating to the avoidance of possible legal liability, rather than with compelling issues of product design directly affecting public health and safety. His insistence that GTE conduct its business "in compliance with the highest ethical business standards," by doing more than was absolutely required by law, met some resistance from others legitimately concerned about profitability. We would be reluctant to conclude that disagreements over the wording of a product warning label, or the hypothetical risk posed by a product, which are matters committed to the business judgment of a company and do not rise to the requisite level of public concern, could be the basis for a wrongful discharge claim. See *King* v. *Driscoll*, 418 Mass. 576, 583 (1994) ("internal administration, policy, functioning, and other matters of an organization cannot be the basis for public policy exception"); *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 474 (1992); *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch.*, supra at 151; *Mello* v. *Stop & Shop Cos.*, 402 Mass. 555, 560-561 (1988); *Mistishen* v. *Falcone Piano Co.*, 36 Mass. App. Ct. 243, 245-246 (1994). However, we need not decide whether Stewart's allegations are sufficient in this regard because we conclude, as matter of law, that Stewart has failed to present sufficient proof of constructive discharge.[13]

Stewart has not claimed that he was formally terminated from his position at GTE. Thus, to sustain his claim for wrongful discharge, it must appear that he will be able to prove that he was constructively discharged from his position as general counsel. A "[c]onstructive discharge occurs when

---

[13]All issues raised in GTE's motion for summary judgment are properly before us.

the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." *Turner* v. *Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1244-1245 (1994).

We have not had occasion to address what an employee must prove to establish a constructive discharge. The elements for proof of constructive discharge have been discussed in a number of cases decided by Federal and State appellate courts, however, and there is general agreement on the elements pertinent to a decision in this case. See, e.g., *id.* at 1247. See also *Slack* v. *Kanawha County Hous. & Redevelopment Auth.*, 188 W. Va. 144, 153 (1992) (collecting cases). In a frequently cited decision, the United States Court of Appeals for the First Circuit has stated that in order for a constructive discharge to be found, "the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Alicea Rosado* v. *Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). The test is met if, based on an *objective* assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable. See *Turner* v. *Anheuser-Busch, Inc.*, supra at 1248. See also *Vega* v. *Kodak Caribbean, Ltd.*, 3 F.3d 476, 481 (1st Cir. 1993); *Aviles-Martinez* v. *Monroig*, 963 F.2d 2, 6 (1st Cir. 1992); *Pena* v. *Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983).

A single, isolated act of an employer (or an agent of the employer) usually will not be enough to support a constructive discharge claim. Thus, evidence of a single unfavorable performance review or even of a demotion generally will not be deemed sufficient to support a claim. See *Turner* v. *Anheuser-Busch, Inc.*, supra at 1247. "In order to amount to a constructive discharge, adverse working conditions must be

unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *Id.*

For example, in *Aviles-Martinez* v. *Monroig, supra* at 6, the court held that an employee had presented sufficient evidence to go to trial on the issue of constructive discharge where it was alleged that the employer had removed all of the employee's files and then chastised him for not doing his work; told the staff that the office was not up to date because of the employee's irresponsibility; and scolded and ridiculed the employee in front of clients almost every day. Conversely, mere dissatisfaction with the nature of assignments, criticism of an employee's performance, and dissatisfaction with compensation have been held insufficient to establish a triable question of fact on the issue of constructive discharge. See *Stetson* v. *NYNEX Serv. Co.,* 995 F.2d 355, 361 (2d Cir. 1993).

Viewing the evidence in the light most favorable to Stewart, and drawing all reasonable inferences in his favor, we nonetheless conclude that the conditions under which Stewart alleges he would have been forced to work had he remained at GTE were not so intolerable that a reasonable person would have felt compelled to resign as general counsel. Stewart was not faced with a demotion, or a loss of job responsibilities or compensation. In addition, nothing in the evidence submitted in support of his opposition to the motion for summary judgment supports his assertion that remaining in his position would have required him to violate his ethical obligations as an attorney. He was not asked to further, commit, or conceal any illegal or fraudulent acts. See *Turner* v. *Anheuser-Busch, Inc., supra* at 1258. Any inference he drew in this regard from his interview with Trevisan is purely speculative.

Stewart had a single, distressing interview with Trevisan, a supervisor with whom his relations had been cordial. He immediately assumed, without further inquiry, that he would be unable to meet new performance goals which were to be established for him, and therefore concluded, based on his perception of the company's actions, that the setting of those

goals would necessarily lead to his dismissal. He left summarily, and then disregarded requests that he return to work. "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast" (emphasis in original). *Garner* v. *Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987). Had Stewart remained at GTE, he might have been required to compromise his own vision of his role in the company, but this cannot be the ground for a claim of constructive discharge. A reasonable person intent on preserving his career would not have construed the interview with Trevisan as the prelude to necessarily intolerable conditions in the work place.

3. The judge granted GTE's motion for summary judgment principally on the strength of the *Balla* decision which precludes any action by in-house counsel for wrongful discharge. The judge did not have the benefit of the *General Dynamics* decision which, as has been discussed, establishes what appears to this court to be the better rule. We have concluded that summary judgment was proper because no triable issue exists on the issue of constructive discharge. An order "which is correct on the facts will be upheld even though the stated ground for the judgment is unsound." *West Broadway Task Force* v. *Boston Hous. Auth.*, 414 Mass. 394, 398 (1993). See *Aetna Casualty & Sur. Co.* v. *Continental Casualty Co.*, 413 Mass. 730, 734-735 (1992). The case is remanded for entry of a judgment in favor of GTE and the remaining defendants-in-counterclaim as to all counts of Stewart's counterclaim.

*So ordered.*