[No. S033640. July 18, 1994.]

GENERAL DYNAMICS CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
ANDREW D. ROSE, Real Party in Interest.

**COUNSEL**

Gibson, Dunn & Crutcher, Jack H. Halgren, Nancy P. McClelland and Steve M. Schultz for Petitioner.

No appearance for Respondent.

S. Myron Klarfeld for Real Party in Interest.

**OPINION**

**ARABIAN, J.**—We granted review to consider an attorney's status as "in-house" counsel as it affects the right to pursue claims for damages following an allegedly wrongful termination of employment. Specifically, we are asked to decide whether an attorney's status as an employee bars the pursuit of implied-in-fact contract and retaliatory discharge tort causes of action against the employer that are commonly the subject of suits by *non*-attorney employees who assert the same claims.

We conclude that, because so-called "just cause" contractual claims are unlikely to implicate values central to the attorney-client relationship, there is no valid reason why an in-house attorney should not be permitted to pursue such a contract claim in the same way as the nonattorney employee. Our conclusion with respect to the tort cause of action is qualified; our holding seeks to accommodate two conflicting values, both of which arise from the nature of an attorney's professional role—the fiducial nature of the relationship with the client, on the one hand, and the duty to adhere to a handful of defining ethical norms, on the other. As will appear, we conclude that there is no reason inherent in the nature of an attorney's role as in-house counsel to a corporation that in itself precludes the maintenance of a retaliatory discharge claim, *provided* it can be established without breaching the attorney-client privilege or unduly endangering the values lying at the heart of the professional relationship.

Although the effect of the attorney-client relationship is to produce a remedy more limited than that available to the nonattorney employee, the similarities between the position of in-house attorneys and their nonattorney

colleagues nevertheless justify an analogous cause of action. The complete economic dependence of in-house attorneys on their employers is indistinguishable from that of nonattorney employees who *are* entitled to pursue a retaliatory discharge remedy. Moreover, as we explain, the position of in-house counsel is especially sensitive to those fundamental ethical imperatives derived from an attorney's professional duties, as well as organizational pressures to ignore or subvert them. On balance, these considerations favor allowing a tort claim for discharges for reasons that contravene an attorney's mandatory ethical obligations or for which a *non*-attorney employee could maintain such a claim *and* a statute or ethical code provision permits the attorney to depart from the usual rule that client matters remain confidential.

The trial courts have at their disposal several measures to minimize or eliminate the potential untoward effects on both the attorney-client privilege and the interests of the client-employer resulting from the litigation of such wrongful termination claims by in-house counsel. Thus, we also hold that, in those instances where the attorney-employee's retaliatory discharge claim is incapable of complete resolution without breaching the attorney-client privilege, the suit may not proceed. That result, however, is rarely, if ever, appropriate where, as in this case, the litigation is still at the pleadings stage.

## I

Andrew Rose, an attorney, began working for General Dynamics Corporation (hereafter General Dynamics) as a 27-year-old contract administrator at its Pomona plant in 1978. He progressed steadily within the organization, earning repeated commendations and, after 14 years with the company, was in line to become a division vice-president and general counsel. On June 24, 1991, he was fired, abruptly and wrongfully.

So Rose alleged in the complaint for damages that began this litigation. The complaint also alleged that although the stated reason for his discharge was a loss of the company's confidence in Rose's ability to represent vigorously its interests, the "real" reasons motivating his firing had more to do with an attempt by company officials to cover up widespread drug use among the General Dynamics work force, a refusal to investigate the mysterious "bugging" of the office of the company's chief of security, and the displeasure of company officials over certain legal advice Rose had given them, rather than any loss of confidence in his legal ability or commitment to the company's interests.

The complaint relied on two main theories of relief. First, it alleged that General Dynamics had, by its conduct and other assurances, impliedly represented to Rose over the years that he was subject to discharge only for

"good cause," a condition that the complaint alleged was not present in the circumstances under which he was fired. Second, the complaint alleged that Rose was actually fired for cumulative reasons, all of which violated fundamental public policies: in part because he spearheaded an investigation into employee drug use at the Pomona plant (an investigation, the complaint alleged, that led to the termination of more than 60 General Dynamics employees), in part because he protested the company's failure to investigate the bugging of the office of the chief of security (allegedly a criminal offense and, since it involved a major defense contractor, a serious breach of national security), and in part as a result of advising General Dynamics officials that the company's salary policy with respect to the compensation paid a certain class of employees might be in violation of the federal Fair Labor Standards Act, possibly exposing the firm to several hundred million dollars in backpay claims.

General Dynamics filed a general demurrer to the complaint, asserting that Rose had failed to state a claim for relief. Because he had been employed as an in-house *attorney*, the company contended, Rose was subject to discharge at any time, "for any reason or for no reason." The trial court overruled the demurrer and the Court of Appeal denied General Dynamics's ensuing petition for a writ of mandate, ruling that, at least at the pleading stage, the complaint was sufficient to survive a general demurrer as to both theories of relief.[1]

## II

The last two decades have seen a marked rise in the number and professional stature of so-called in-house or corporate counsel. Increasingly, large corporations have turned inward for the acquisition of legal services, for a host of reasons ranging from cost incentives, to the increasing complexity of the regulatory environment, to the programmatic style characteristic of such organizations. According to a study conducted in the early 1980's, 50,000 lawyers were on corporate payrolls, a figure double that of 15 years earlier; a more recent survey indicates that more than 10 percent of all lawyers in the United States are employed in-house by corporations.[2]

The growth in the number and role of in-house counsel has brought with it a widening recognition of the descriptive inadequacy of the nineteenth

---

[1] It is perhaps unnecessary to point out that at this early stage of the lawsuit, this court, like the Court of Appeal, is obliged to accept as true all well-pleaded allegations of the complaint for the purpose of assessing its sufficiency to withstand a demurrer. Whether additional pretrial procedures designed to go behind the face of the complaint and expose meritless claims will be successful in this matter is a question we have no occasion to consider given the posture of this case.

[2] (See, e.g., Wolfram, Modern Legal Ethics (1986 ed.) § 13.7.3, at pp. 736-738 & fns. 89-99 [hereafter Wolfram]; Giesel, *The Ethics or Employment Dilemma of In-House Counsel* (1990)

century model of the lawyer's place and role in society—one based predominantly on the small- to middle-sized firm of like-minded attorneys whose economic fortunes were not tethered to the good will of a single client —and of the social and legal consequences that have accompanied that transformation. Unlike the law firm partner, who typically possesses a significant measure of economic independence and professional distance derived from a multiple client base, the economic fate of in-house attorneys is tied directly to a single employer, at whose sufferance they serve. Thus, from an economic standpoint, the dependence of in-house counsel is indistinguishable from that of other corporate managers or senior executives who also owe their livelihoods, career goals and satisfaction to a single organizational employer.

Moreover, the professional relationship between the in-house attorney and the client is not the "one shot" undertaking—drafting a will, say, or handling a piece of litigation—characteristic of the outside law firm. Instead, the corporate attorney-employee, operating in a heavily regulated medium, often takes on a larger advisory and compliance role, anticipating potential legal problems, advising on possible solutions, and generally assisting the corporation in achieving its business aims while minimizing entanglement in the increasingly complex legal web that regulates organizational conduct in our society. This expansion in the scope and stature of in-house counsel's work, together with an inevitably close professional identification with the fortunes and objectives of the corporate employer, can easily subject the in-house attorney to unusual pressures to conform to organizational goals, pressures that are qualitatively different from those imposed on the outside lawyer. Even the most dedicated professionals, their economic and professional fate allied with that of the business organizations they serve, may be irresistibly tempted to cut corners by bending the ethical norms that regulate an attorney's professional conduct.

Indeed, the analogy of in-house counsel's position to that of his or her lay colleagues in the executive suite is inexact only because, as a licensed professional, an attorney labors under unique ethical imperatives that *exceed* those of the corporate executive who seeks, say, a tort remedy after being terminated for refusing to join a conspiracy to violate the antitrust laws. (See, e.g., *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] [*Tameny*].) We turn, then, to

5 Geo.J. Legal Ethics 535, 540-545 & accompanying fns. [hereafter Giesel].) For an account of the rise of the corporate legal department and its implications for the traditional "outside" law firm, see the series of articles in volume 37 of the Stanford Law Review. (Chayes & Chayes, *Corporate Counsel and the Elite Law Firm* (1984) 37 Stan.L.Rev. 277; Comment (1984) 37 Stan.L.Rev. 301; Comment (1984) 37 Stan.L.Rev. 305.)

a consideration of the effects of in-house counsel's professional role and ethical duties on access to judicial remedies for alleged wrongful termination that are available to the nonattorney colleague.

### III

### A

If there is a unifying theme in this conflict, it is the claim of General Dynamics that our opinion in *Fracasse* v. *Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9] (*Fracasse*) is dispositive of all issues tendered against it by Rose in his complaint. Because *Fracasse* cloaks the client in an unfettered, absolute right to discharge an attorney at any time and for any reason, General Dynamics argues, the complaint cannot state a claim against the company that is judicially cognizable; the trial court should thus have sustained General Dynamics's demurrer without leave to amend.

In *Fracasse*, *supra*, 6 Cal.3d 784, an attorney entered into a contingent fee contract with a client to represent her as a plaintiff in a personal injury lawsuit. Not long afterward—and before any recovery had been made on her behalf—the client decided to end the relationship. She discharged the attorney, and retained other counsel to pursue her claim. The former attorney then filed a declaratory relief action against her, alleging that he had been discharged without cause and in breach of the contingency fee agreement, and seeking a judgment that he was entitled to his one-third contingency fee as a percentage of any sum ultimately recovered by his former client. The trial court sustained the client's demurrer, ruling that the complaint failed to state a claim for relief.

Although the core proposition established by our opinion in *Fracasse*, *supra*, 6 Cal.3d at page 790, affirming the trial court, undoubtedly remains valid—we concluded that "a client should have both the right and the power at any time to discharge his attorney with or without cause"—our holding in that case does not support the sweeping scope urged for it by General Dynamics. It should be evident to anyone reading our opinion in *Fracasse* that we confronted there one of the most common of the traditional forms of the lawyer-client relationship: the potential claimant who seeks redress by hiring an independent professional to prosecute her claim for personal injuries.

Our holdings in that case were expressly founded on the recognition that a client who retains an attorney to prosecute a personal injury action under a contingent fee agreement "may and often is very likely to be a person of

limited means for whom the contingent fee arrangement offers the only realistic hope of establishing a legal claim." (*Fracasse, supra,* 6 Cal.3d at p. 792.) We had such concerns in mind when we wrote that the contingent fee client " 'must rely almost entirely upon the good faith of the attorney who alone can make an informed estimate of the value of the client's legal right and of the expense and effort necessary to enforce it.' " (*Id.* at p. 789, quoting *Salopek* v. *Schoemann* (1942) 20 Cal.2d 150, 157 [124 P.2d 21].) " 'The client,' " we observed, " 'may frequently be forced to choose between continuing the employment of an attorney in whom he has lost faith, or risking the payment of double contingency fees equal to the greater portion of any amount eventually recovered. . . .' " (*Ibid.*)

In stating that "the client's power to discharge an attorney, with or without cause, is absolute . . . ," we relied on the provisions of Code of Civil Procedure section 284, permitting a change of attorneys in "an action or special proceeding." (*Fracasse, supra,* 6 Cal.3d at p. 790; see also *Santa Clara County Counsel Attys. Assn.* v. *Woodside* (1994) 7 Cal.4th 525, 555 [28 Cal.Rptr.2d 617, 869 P.2d 1142].) In light of the specific hazards confronting the contingent fee plaintiff who has lost confidence in his or her attorney—notably the risk of guessing wrong whether cause for discharge existed and thereby losing "73⅓ percent of a recovered judgment"—we concluded that it "should be sufficient that the client has, for whatever reason, lost faith in the attorney, to establish 'cause' for discharging him." (*Fracasse, supra,* 6 Cal.3d at p. 790.) Finally, we reasoned that, "since the attorney agreed initially to take his chances on recovering any fee whatever, we believe that the fact that the success of the litigation is no longer under his control is insufficient to justify imposing a new and more onerous burden on the client." (*Id.* at p. 792.) "It follows," we concluded, "that the attorney will be denied compensation in the event such recovery is not obtained." (*Ibid.*)

Entwined with our concern for the specific risks facing the contingent-fee plaintiff who has lost faith in her attorney was an underlying perception that, whatever the circumstances, *no* client should be forced to suffer representation by an attorney in whom that confidence and trust lying at the heart of a fiduciary relationship has been lost. It is not surprising, given this chain of reasoning, that our opinion in *Fracasse, supra,* 6 Cal.3d 784, should establish as bedrock law what remains probably *the* central value of the lawyer-client relationship—the primacy of fiducial values and its corollary: the unilateral right of the client to sever the professional relationship at any time and for any reason.

That rule, which we reaffirm today, some 22 years after our decision in *Fracasse, supra,* 6 Cal.3d 784, does not mean, however, that the "absolute"

right of the personal injury client to discharge unilaterally his attorney permits *all* clients to terminate the attorney-client relationship under *all* circumstances without consequence. The sources of contract and tort claims in wrongful termination cases are analytically distinct from the circumstances confronting the contingent-fee plaintiff that propelled our analysis in *Fracasse*. Given these disparate origins, it is unlikely that the client's undoubted power to discharge the attorney at will is one that can be invoked under all circumstances *without consequence*. Even in *Fracasse*, we recognized the requirement that the dissatisfied personal injury contingent fee client compensate discharged counsel, limiting that obligation, in light of the peculiar risks associated with contingent fee undertakings, to the reasonable value of any services provided in the event of a recovery.

Additionally, General Dynamics' claim of an unqualified immunity from any liability for terminating in-house counsel is inconsistent with the law in other areas, notably claims grounded in alleged violations of antidiscrimination laws and statutory rights to public collective bargaining. (See, e.g., *Hishon* v. *King & Spalding* (1984) 467 U.S. 69 [81 L.Ed.2d 59, 104 S.Ct. 2229] [federal civil rights laws apply to law firm partnership decisions]; *Golightly-Howell* v. *Oil, Chemical & Atomic Workers* (D.Colo. 1992) 806 F.Supp. 921, 924 ["[B]ecause Title VII prohibits discrimination based on race or sex, it prohibits such discrimination against one employed as in-house counsel."]; *Santa Clara County Counsel Attys. Assn.* v. *Woodside, supra,* 7 Cal.4th 525 [Meyers-Milias-Brown Act creates an exception to the general rule that a client may discharge an attorney at will].)

Indeed, General Dynamics's complete reliance on *Fracasse, supra,* 6 Cal.3d 784, as dispositive of Rose's claims proves too much. If, as a matter of legal doctrine, the client's right of discharge can be invoked without consequence in all circumstances, it might easily produce unconscionable results. Suppose an attorney in New York responds to a professional advertisement seeking an assistant general counsel for a corporation headquartered in Los Angeles. A series of negotiations ensues and the parties execute a written contract under which the employer agrees to hire the attorney to perform legal work as a full time employee for an agreed salary. Suppose further that the agreement provides that the attorney can only be terminated for specified reasons. The newly hired lawyer-employee then sells his house, moves family and goods across the country, buys a new home, enrolls his children in local schools, and begins his new employment. Three months later, he is summarily fired by the company for reasons that are not among those stipulated in the employment contract. To insist in the face of such egregious circumstances that our opinion in *Fracasse, supra,* 6 Cal.3d 784, immunizes the employer by providing an "absolute" right to discharge the

employee with *complete* impunity, foreclosing suit on the contract terms, would compel us to embrace an intuitively unjust, even outrageous, result on the basis of a holding expressly shaped by the unique concerns confronting the contingent fee personal injury client who has lost faith in counsel.

 In exercising their common law powers, courts do not kneel in blind obedience to such misguided reliance on precedent. Mindful of the maxim that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used" (*Cohens* v. *Virginia* (1821) 19 U.S. (6 Wheat.) 264, 399 [5 L.Ed.2d 257, 290]), they seek in every case a just resolution, identifying those circumstances that lay claim to conscience, considered in light of *applicable* principles of law.[3] While the "unfettered" right of the client to discharge his attorney at any time is an important value that should be upheld in most cases, the legal *consequences* of such an act will vary, depending on the strength of competing interests that are present in a particular case.

Given the circumstances of attorney and client in the typical contingent fee personal injury case—well illustrated by the facts in *Fracasse, supra,* 6 Cal.3d 784—we reached a resolution of competing claims tailored to the strengths of the interests of the parties: securing the client's right of unilateral discharge while recognizing that, in light of the speculative nature of contingent fee claims, the discharged attorney was fairly compensated by payment of the reasonable value of his services in the event of a recovery on the client's behalf. In sum, our language in *Fracasse, supra,* 6 Cal.3d 784, should not be read as standing for more than its context and rationale will reasonably support.

B

 How does the fundamental rule of the client's unilateral power of discharge announced in *Fracasse, supra,* 6 Cal.3d 784, apply in the circumstances of this case? First, Rose's complaint does not contest the right of

---

[3]Although we said in *Fracasse, supra,* 6 Cal.3d at page 791, that it "would be anomalous and unjust to hold the client liable in damages for exercising [a] basic implied right [of discharge]," that broad phrase—on which General Dynamics appears to rest its demurrer— must be understood in the context of our discussion of the contingent fee personal injury agreement in which it appears. We cited the New York case of *Martin* v. *Camp* (1916) 219 N.Y. 170 [114 N.E. 46] as supporting our rationale for limiting discharged counsel to recovery in quantum meruit. (6 Cal.3d at p. 791.) That case, in turn, held that "[t]he discharge of the attorney by his client does not constitute a breach of the contract, because it is a term of such contract . . . that the client may terminate [it] at any time with or without cause." (114 N.E. at p. 48.) The New York court went on to note expressly, however, that "the rule that the attorney is limited to a recovery in quantum meruit does not relate to a case where the attorney . . . is employed under a general retainer for a fixed period to perform legal services in relation to matters that may arise during the period of the contract." (*Ibid.*)

General Dynamics to terminate a member of its corporate legal department at any time or for any reason, nor could it. It simply asserts that there is a cost to be paid for such an action under the circumstances alleged in the complaint—either in lost wages and related damages in the case of the implied-in-fact contract claim, or as tort damages in the case of the public policy tort claim. (Cf. *Howard* v. *Babcock* (1994) 6 Cal.4th 409, 419 [25 Cal.Rptr.2d 80, 863 P.2d 150] [law firm "non-compete" agreement "attaches an economic consequence to a departing partner's unrestricted choice to pursue a particular kind of practice."].) In neither case, however, is the client's power to rid itself of an attorney in whom it has lost confidence thwarted. To the extent that General Dynamics's claim that its "unfettered" right to discharge a member of its corporate legal department means that it may do so without liability of any kind under all circumstances, that is not, and never has been, the law of this state.

As a threshold matter, then, we do not feel constrained by our opinion in *Fracasse, supra*, 6 Cal.3d 784, from considering the proposition that, under circumscribed conditions, an in-house attorney may pursue a wrongful discharge claim for damages against his corporate employer *even though* a judgment ordering his reinstatement is *not* an available remedy. We turn to a consideration of the merits of plaintiff's claims that his termination breached an implied-in-fact agreement with General Dynamics and violated fundamental public policies, as well as the possible limitations on the vitality of such claims when brought by in-house counsel.

IV

As the name suggests, an implied-in-fact contract claim as a limitation on an employer's historical at-will power to terminate one of its employees is rooted in the conduct of the parties to the employment relationship itself. As such, it is a branch of the law of contracts and subject to the time-honored notion that contractual bargains ought to be enforced unless there is some imperative—generally rooted in policies external to the employment relationship—that prevents a court from doing so. At this stage of the litigation, General Dynamics' facial challenge to Rose's implied-in-fact contract claim does not attack the factual accuracy of the allegations of the complaint. It would, of course, be inappropriate to do so in a demurrer testing the legal sufficiency of the plaintiff's theory of relief.

Instead, General Dynamics' challenge is simply a corollary to its claim that our opinion in *Fracasse, supra*, 6 Cal.3d 784, applies globally to immunize an employer from *any* liability as a consequence of terminating an attorney-employee. As we have seen, however, *Fracasse*, although sustaining the unilateral right of a client to terminate the professional relationship at

any time, does not squarely encompass the many differences present in a employer-employee, attorney-client relationship. House counsel is not an independent practitioner with a base of multiple clients, retained on a contingent fee basis to accept the risks inherent in litigating personal injury claims. A private corporation with an office of general counsel and a large corporate legal staff is not in any material sense analogous to the personal injury plaintiff of limited means who seeks representation in a single matter. In short, the interests and expectations of the parties to such a relationship are substantially different from those we found determinative in *Fracasse*.

Perhaps the overriding distinction between *Fracasse, supra,* 6 Cal.3d 784, and this case lies in the allegations of the complaint that the plaintiff was hired as a "career oriented" employee with an expectation of permanent employment, provided his performance was satisfactory; that he was promised job security and substantial retirement benefits; that he regularly received outstanding performance reviews, promotions, salary increases, and commendations throughout his 14-year tenure; and that the company abruptly terminated him without adhering to its published discharge procedures.

These pleadings, we conclude, adequately allege that a "course of conduct, including various oral representations, created a reasonable expectation" that the plaintiff would not be terminated without good cause. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 675 [254 Cal.Rptr. 211, 765 P.2d 373] [hereafter *Foley*].) The factual allegations of the complaint being sufficient to withstand a general demurrer, we see no reason in policy, at least at the outset, why the plaintiff's status as an in-house attorney should operate to defeat his contract claim. It is true, as we have just affirmed, that General Dynamics has a right to discharge any member of its general counsel's staff in whom it has lost confidence. That right does not mean, however, that it may do so without honoring antecedent contractual obligations to discharge an attorney-employee only on the occurrence of specified conditions.

In short, implied-in-fact limitations being a species of contract, no reason appears why an employer that elects to limit its at-will freedom to terminate the employment relationship with in-house counsel should not be held to the terms of its bargain. The Minnesota Supreme Court has put the nub of the matter succinctly: "The fact remains . . . that the in-house attorney is also a company employee, and we see no reason to deny the job security aspects of the employer-employee relationship if this can be done without violence to the integrity of the attorney-client relationship. For matters of compensation, promotion, and tenure, inside counsel are ordinarily subject to the same

administrative personnel supervision as other company employees. These personnel arrangements differ from the traditional scenario of the self-employed attorney representing a client; and these differences are such, we think, that the elements of client trust and attorney autonomy are less likely to be implicated in the employer-employee aspect of the in-house counsel status." (*Nordling* v. *Northern States Power Co.* (Minn. 1991) 478 N.W.2d 498, 502; see also *Mourad* v. *Automobile Club Ins. Ass'n* (1991) 186 Mich.App. 715 [465 N.W.2d 395, 400] [Senior in-house counsel, fired for refusing to permit nonattorney employees of his insurance company employer to supervise outside counsel representing the company's insureds, sought damages alleging the company's practice violated the Code of Professional Responsibility and that his discharge breached an implied just-cause term of his employment contract. *Held*: by hiring plaintiff as an attorney, defendants "knew or should have known that plaintiff was bound by the code of professional conduct and incorporated this fact in creating a just-cause employment contract."].)

We agree that, as creatures of contract, implied-in-fact limitations on a client-employer's right to discharge in-house counsel are not likely to present issues implicating the distinctive values subserved by the attorney-client relationship. Such suits can thus for the most part be treated as implied-in-fact claims brought by the nonattorney employee.

The fact that the claim in this case is alleged to have arisen by implication rather than by written agreement is a feature of all implied-in-fact just-cause claims; it is by no means unique to the attorney-client relationship. In any event, employers who wish to treat their in-house legal personnel differently from other workers have a variety of means to limit the potential for exposure. Without addressing the question in detail, we note that in the case of confidential corporate employees such as attorneys, an employer has wide latitude in determining the circumstances under which it has just or good cause to terminate the relationship. (See, e.g., *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743 [250 Cal.Rptr. 195]; *Fowler* v. *Varian Associates, Inc.* (1987) 196 Cal.App.3d 34 [241 Cal.Rptr. 539]; cf. *Santa Clara County Counsel Attys. Assn.* v. *Woodside, supra,* 7 Cal.4th at p. 557 [statutory bargaining rights of publicly employed attorneys do not impede client's right to refuse representation so long as it is done "nonpunitively"].)

V

A

We turn next to an evaluation of Rose's claim that he was discharged for multiple reasons, each of which violated a "fundamental polic[y]

that [is] delineated in constitutional or statutory provisions" of the law of this state. (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].) Unlike implied-in-fact contract claims, which, as discussed above, arise out of the conduct and expectations of the parties to the employment relationship, so-called public policy wrongful discharge claims are pure creatures of law.

■ As we observed in *Foley, supra,* 47 Cal.3d at page 667, " 'the theoretical reason for labeling the discharge wrongful in such cases is not based on the terms and conditions of the contract, but rather arises out of a duty implied in law on the part of the employer to conduct its affairs in compliance with public policy . . . . [T]here is no logical basis to distinguish in cases of wrongful termination for reasons violative of fundamental principles of public policy between situations in which the employee is an at-will employee and [those] in which the employee has a contract for a specified term. *The tort is independent of the term of employment.*' " (Italics added, quoting *Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155, 116 [226 Cal.Rptr. 820]; see also *Tameny, supra,* 27 Cal.3d 167, 176 ["an employer's obligation to refrain from discharging an employee who refuses to commit a criminal act does not depend upon any express or implied ' "promise[] . . ." ' but rather reflects a duty imposed by law upon all employers in order to implement the fundamental public policies embodied in the state's penal statutes"].)

According to a recent count, 43 jurisdictions have adopted the so-called "retaliatory discharge" cause of action as a restraint on the employer's historical at-will power of termination. (See Note, *In-house Counsel's Right to Sue for Retaliatory Discharge* (1992) 92 Col. L.R. 389, 394.) In California, refinements in the doctrine of wrongful discharge in violation of public policy have engrafted two prominent restraints on the vitality of such claims. The first is the requirement, explicated in our decision in *Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th at page 1095, that the public policy at issue must be one that is not only "fundamental" but is clearly established in the Constitution and positive law of the state. The second restriction, one of the subjects of our opinion in *Foley, supra,* 47 Cal.3d 654, is the requirement that, even though established by positive law, the policy subserved by the employee's conduct must be a truly *public* one, that is, "affect[ing] a duty which inures to the benefit of the *public at large* rather than to a particular employer or employee." (*Id.* at p. 669, italics added.)

There is a third characteristic of such claims that warrants our attention, one that may, in the case of in-house counsel, be of surpassing significance. That characteristic is well stated in *Foley, supra,* 47 Cal.3d 654, where we

explained that "decisions recognizing a tort action for discharge in violation of public policy *seek to protect the public, by protecting the employee* who refuses to commit a crime [citations] . . . , who reports criminal activity to proper authorities [citations], or who discloses other illegal, unethical, or unsafe practices [citation]" (*id.* at p. 670, italics added).

In other words, although the public policy served by the conduct of the aggrieved employee at issue may often be directly protective of the interest in employment itself, the doctrinal foundation of the public policy tort claim is not so much the *plaintiff's* continued interest in employment as the preservation of the *public* interest as it is expressed in multiple forms in the Constitution and statutory law. An employee who states a wrongful discharge claim for having refused to join a criminal conspiracy in violation of the antitrust laws (cf. *Tameny, supra,* 27 Cal.3d 167), or for having resisted efforts to induce him to give false information in a public investigation of sexual harassment charges filed by a co-worker (cf. *Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th 1083), is provided a remedy in tort *not only* to compensate the individual plaintiff for the loss of employment but as an indirect means of vindicating the underlying fundamental *public policy itself.*

B

 This foundational *public* rationale is especially important in the case of the attorney-employee. Perhaps the defining feature of professionals as a class is the extent to which they embody a dual allegiance. On the one hand, an attorney's highest duty is to the welfare and interests of the client. This obligation is channeled, however, by a limiting and specifically *professional* qualification: attorneys are required to conduct themselves *as such,* meaning that they are bound at all events not to transgress a handful of professional ethical norms that distinguish their work from that of the nonattorney.[4]

Some (but not all) of these professional norms incorporate important *public* values. Lawyers are given wide professional license in part because of ethical restraints on their discretion designed to further (or at least not endanger) the public weal. The minimal ethical standards that distinctively define the lawyer as a professional are, of course, those embodied in the codes of ethics, and, in California, in the Rules of Professional Conduct. These standards are in turn linked by their nature and goals to important

---

[4]For material on the defining characteristics of the professions and the status and role of the ethical codes in regulating attorney conduct, see Wolfram, *supra,* §§ 1.5, 2.6-2.7; Moskowitz, *Employment-at-will & Codes of Ethics: The Professional's Dilemma* (1988) Val. U.L.Rev. 33 (hereafter Moskowitz); Giesel, *supra,* 5 Geo.J. Legal Ethics 535, 551-557 & accompanying fns.

values affecting the public interest at large. It is through this chain of ethical duty that lawyers and their work are affected with a public interest. Out of this duality of allegiance—for the interests of the client on the one hand, but within the bounds of ethical norms on the other—a genuine moral dilemma may arise.

This is especially so in the context of the large commercially driven corporation whose essential objectives are largely defined by the desire to maximize profitability. In such a business culture, the in-house professional may be trapped between a laudable desire to further the goals of the client-employer and restrictions on conduct imposed by the ethical norms prescribed by the Rules of Professional Conduct. Of course, the potential for such a dilemma is common to outside counsel as well. But, unlike their in-house counterparts, outside lawyers enjoy a measure of professional distance and economic independence that usually serves to lessen the pressure to bend or ignore professional norms. Here again, the distinguishing feature of the in-house attorney is a virtually complete dependence on the good will and confidence of a single employer to provide livelihood and career success.

The case for shielding the in-house attorney—among *all* corporate employees—from retaliation by the employer for either insisting on adhering to mandatory ethical norms of the profession or for refusing to violate them is thus clear. And because their professional work is by definition affected with a public interest, in-house attorneys are even more liable to conflicts between corporate goals and professional norms than their nonattorney colleagues. On this view, then, in-house counsel, forced to choose between the demands of the employer and the requirements of a professional code of ethics have, if anything, an *even more* powerful claim to judicial protection than their nonprofessional colleagues.

## C

There is a substantial counterargument against permitting the pursuit of a retaliatory discharge *tort* claim by in-house counsel, one that also inheres in the essential nature of the attorney's professional role. Indeed, in the handful of reported cases dealing with the question, a majority of courts have refused to permit the maintenance of such suits on the ground that they pose *too great* a threat to the attorney-client relationship. This rationale is well illustrated in a trio of recent cases, each holding as a matter of law that retaliatory discharge suits by in-house counsel are not maintainable.

The leading opinion is perhaps *Balla* v. *Gambro, Inc.* (1991) 145 Ill.2d 492 [164 Ill.Dec. 892, 584 N.E.2d 104, 16 A.L.R.5th 1000] (hereafter *Balla*),

a case in which the general counsel of an Illinois distributor of German-made dialysis equipment sued his employer for wrongful discharge, complaining that he had learned internally of major defects in several dialysis machines shipped to his employer for distribution in the American market, defects which put users at serious risk of uremic poisoning. He advised his superiors to reject the machines as not in compliance with Food and Drug Administration (FDA) regulations and as potentially dangerous to consumers. On later learning that company officials had accepted delivery of the units for sale to a customer " 'who buys only on price,' " plaintiff confronted the company president and told him that he would "do whatever necessary to stop the sale of the dialyzers." (*Id.* at p. 106.)

After being abruptly fired two weeks later, the lawyer-employee reported the equipment defects to FDA officials the following day; they seized the machines as "adulterated" within the meaning of the federal act and the employee filed a damage action for retaliatory discharge, contending that he was fired for reasons that contravened a fundamental public policy. (584 N.E.2d at pp. 106-107.) The Illinois Supreme Court agreed that plaintiff's discharge "was in contravention of a clearly mandated public policy. . . . As we have stated before, '[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens.' " (*Id.* at pp. 107-108.) The court declined, however, to permit the plaintiff to maintain a retaliatory discharge action because he "was not just an employee of [defendant], but also general counsel for [defendant]." (*Id.* at p. 108.) Basing its decision "as much on the nature and purpose of the tort of retaliatory discharge, as on the effect on the attorney-client relationship that extending the tort would have," the court cited two reasons why such suits should not be maintainable. (*Ibid.*)

First, "the public policy to be protected, that of protecting the lives and property of citizens, is adequately safeguarded without extending the tort of retaliatory discharge to in-house counsel. [Plaintiff] was required under the Rules of Professional Conduct to report [defendant's] intention to sell [the dialyzers]." (584 N.E.2d at pp. 108-109.) Unlike other employees "[who] would be left with the difficult decision of choosing between whether to file a . . . claim and risk being fired, or retaining their jobs and losing their right to a remedy [citation], . . . [i]n-house counsel do not have a choice of whether to follow their ethical obligations as attorneys . . . , or follow the illegal and unethical demands of their clients. . . . [Plaintiff] had no choice but to report to the FDA Gambro's intention to sell . . . [the] dialyzers, and consequently to protect . . . public policy." (*Id.* at p. 109.) Moreover, permitting such suits would "have an undesirable effect on the attorney-client relationship that exists between . . . employers and their in-house

counsel. . . . [E]mployers might be less willing to be forthright and candid with their in-house counsel [and] might be hesitant to turn to their in-house counsel for advice regarding potentially questionable . . . conduct . . . ." (*Ibid.*)

In its basic reasoning, the Illinois Supreme Court in *Balla, supra,* 584 N.E.2d 104, relied on a prior opinion of that state's intermediate appellate court in *Herbster* v. *North American Co.* (1986) 150 Ill.App.3d 21 [103 Ill.Dec. 322, 501 N.E.2d 343] (*Herbster*). There, the former chief legal officer and vice-president in charge of the corporate legal department for a life and health insurance underwriter alleged that he was fired after he protested being ordered to remove or destroy sensitive internal company documents subject to a discovery request in litigation brought by an insured then pending in an Alabama federal court. Such conduct, the plaintiff alleged, would have been a fraud on the Alabama court and would have violated several provisions of the Illinois Code of Professional Responsibility. (*Id.* at p. 344.)

The *Herbster* court agreed that public policy considerations supported one element of the retaliatory discharge cause of action, but concluded that was insufficient: "[W]e cannot," the court wrote, "separate plaintiff's role as an employee from his profession." (501 N.E.2d at p. 346.) "[U]nlike . . . employees in [other] retaliatory discharge cases, attorneys occupy a special position in our society," the court said. (*Ibid.*) "The mutual trust, exchanges of confidence, reliance on judgment and personal nature of the attorney-client relationship demonstrate the unique position attorneys occupy in our society. . . . The attributes of the relationship are so important that we can not permit this expansion of the [retaliatory discharge] exception which would have a serious impact on that relationship. . . ." (*Id.* at p. 348; see also *Willy* v. *Coastal Corp.* (S.D.Tex. 1986) 647 F.Supp.116, 117-118, revd. in part on other grounds (5th Cir. 1986) 855 F.2d 1160, affd. on other grounds 503 U.S. __ [117 L.Ed.2d 280, 112 S.Ct. 1076] [herafter *Willy*] [granting employer's motion to dismiss complaint of plaintiff house counsel who alleged he was discharged for giving the company legal advice concerning "compliance with various federal and state environmental laws," on the ground that "[i]f an attorney believes that his client is intent upon pursuing an illegal act, the attorney's option is to voluntarily withdraw from employment. . . . The standard is the same for an in-house attorney."].)

Those courts that have declined to permit in-house counsel to pursue retaliatory discharge claims—in *Balla, Herbster,* and *Willy*—have rested their conclusion on two distinct grounds: First, because the fiducial qualities of their professional calling pervade the attorney-client relationship—"lawyers are different." It is essential to the proper functioning of the lawyer's

role that the client be assured that matters disclosed to counsel in confidence remain sacrosanct; to permit in-house attorneys to file suit against their clients can only harm that relationship. Second, to the extent that the retaliatory discharge tort rests on underpinnings designed to secure fundamental public policies, a tort remedy for in-house counsel is redundant—such attorneys are under an ethical obligation to sever their professional relationship with the erring client in any event—meaning, in the case of in-house counsel, resigning their employment.

## D

There is no doubt that the Illinois courts in *Balla, supra*, 584 N.E.2d 104, and *Herbster, supra*, 501 N.E.2d 343, grappled conscientiously with the conflicting values presented by cases such as this one. If their reasoning and conclusions can be faulted, it is because one searches in vain for a principled link between the ethical duties of the in-house attorney and the courts' refusal to grant such an employee a tort remedy under conditions that directly implicate those professional obligations. As more than one critic of these opinions has pointed out, both cases appear to reflect not only an unspoken adherence to an anachronistic model of the attorney's place and role in contemporary society, but an inverted view of the consequences of the in-house attorney's essential professional role.[5]

As one authoritative commentator on lawyers' ethics, criticizing the court's decision in *Balla, supra*, 584 N.E.2d 104, has written, "It is clear that there would have been a right of action had the employee not been a lawyer. It thus seems bizarre that a lawyer employee, who has affirmative duties

---

[5]Despite the fact that no more than a handful of such cases have been reported nationally, scholarly comment on the issues raised in retaliatory discharge tort claims by in-house counsel is disproportionately large. (For a sampling, see Feliu, *Discharge of Professional Employees: Protecting Against Dismissal for Acts Within a Professional Code of Ethics* (1979) 11 Colum. Hum. Rts. L.Rev. 149; Wilbur, *Wrongful Discharge of Attorneys: A Cause of Action to Further Professional Responsibility* (1988) 92 Dick. L.Rev. 777; Abramson, *Why Not Retaliatory Discharge for Attorneys: A Polemic* (1991) 59 Tenn. L.Rev. 271; Note, *A Remedy for the Discharge of Professional Employees Who Refuse to Perform Unethical or Illegal Acts: A Proposal in Aid of Professional Ethics* (1976) 28 Vand. L.Rev. 805; Moskowitz, *supra*, 23 Val. U.L.Rev. 33; Schneyer, *Professionalism and Public Policy: The Case of House Counsel* (1988) 2 Geo.J. Legal Ethics 449; Note, *In-House Counsel's Right to Sue for Retaliatory Discharge* (1992) 92 Colum. L.Rev. 389; Giesel, *supra*, 5 Geo.J. Legal Ethics 535; Gillers, *Protecting Lawyers Who Just Say No* (1988) 5 Ga.State U.L.Rev. 1; Reynolds, *Wrongful Discharge of Employed Counsel* (1988) 1 Geo.J. Legal Ethics 553; Kalish, *The Attorney's Role in the Private Organization* (1988) 59 Neb. L.Rev. 1; Schneyer, *Limited Tenure for Lawyers and the Structure of Lawyer-client Relations: A Critique of the Lawyer's Proposed Right to Sue for Wrongful Discharge* (1988) 59 Neb.L.Rev. 11. In addition, Freedman, *Understanding Lawyers' Ethics* (1990), Wolfram, *supra*, and Hazard and Hodes, The Law of Lawyering (2d ed. 1990) offer more general accounts of attorney ethics in an organizational context.)

concerning the administration of justice, should be denied redress for discharge resulting from trying to carry out those very duties. A good beginning point for analysis may well be the client's normal and broad right to discharge the lawyer, but that cannot be the ending point as well, for the lawyer-client relationship exists in a context of other law regulating both parties to that relationship, including the lawyer's duties to third persons, the courts, and the government." (1 Hazard & Hodes, The Law of Lawyering, *supra*, § 1.16.206 at p. 477, fns. omitted.)

Granted the priest-like license to receive the most intimate and damning disclosures of the client, granted the sanctity of the professional privilege, granted the uniquely influential position attorneys occupy in our society, it is precisely *because of* that role that attorneys should be accorded a retaliatory discharge remedy in those instances in which *mandatory ethical norms* embodied in the Rules of Professional Conduct *collide with illegitimate demands of the employer* and the attorney insists on *adhering to his or her clear professional duty*. It is, after all, the office of the retaliatory discharge tort to vindicate fundamental public policies by encouraging employees to act in ways that advance them. By providing the employee with a remedy in tort damages for resisting socially damaging organizational conduct, the courts mitigate the otherwise considerable economic and cultural pressures on the individual employee to silently conform.

Within their area of professional competence, in-house attorneys, more than other organizational employees, are imbued with ethical constraints on the direction their efforts may legitimately take. Among other strictures on their conduct, they may not be a party to the commission of a crime, destroy evidence or suborn perjury. They are forbidden to do these things by the very ethical codes that define their professional identity. It is a short step from this premise to the conclusion that in-house lawyers ought to have access to a judicial remedy in those instances in which their employment is terminated for adhering to the requirements of just such a mandatory professional duty, either by an *affirmative act* required by the ethical code or statute or by resisting a demand of the employer on the ground that it is unequivocally *barred* by the professional code.

Although none has involved the common law right of in-house counsel to maintain retaliatory discharge claims presented by the complaint in this case, several cases *have* recognized the importance of professional ethical codes as a counterweight to employer overreaching. In *Parker* v. *M & T Chemicals, Inc.* (1989) 263 N.J.Super. 451 [566 A.2d 215], for example, the chief in-house patent attorney for a manufacturer of electronic chemicals, alleging that he was demoted and later constructively discharged for refusing to copy

technical information purloined from a sealed federal court file, filed a damage suit under the New Jersey whistle-blower statute. The company defended on the ground that "a client has a right to discharge an attorney employed by a corporation as house counsel, with or without cause, and without fear of sanction . . . at any time the client corporation chooses to end the relationship, notwithstanding the provisions [of the whistle-blower statute] . . . ." (*Id.* at p. 219.)

The court rejected the employer's defense, holding that the conduct at issue was not only within the statute but not in conflict with the attorney-client relationship: "Our . . . construction of the Act compels a retaliating employer to pay damages to an employee-attorney who is wrongfully discharged or mistreated for refusing to join a scheme to cheat a competitor or, indeed, for any reason which is violative of law, fraudulent, criminal, or incompatible with a clear mandate of New Jersey's public policy concerning public health, safety or welfare. The employer is always free to show that the discharge was animated by incompetence, disloyalty, reduction in force, or any other legitimate reason." (*Parker* v. *M & T Chemicals, Inc., supra,* 566 A.2d at p. 220; see also, *Wieder* v. *Skala* (1992) 80 N.Y.2d 628 [593 N.Y.S.2d 752, 609 N.E.2d 105, 109-110] [reinstating a contract claim by a law firm associate who alleged he was fired for demanding that serious professional misconduct by another lawyer in the firm be reported as required by governing disciplinary rules, reasoning that "[i]ntrinsic to [the employment] relationship was the unstated but essential compact that in conducting the firm's legal practice both plaintiff and the firm would do so in compliance with the prevailing rules of conduct and ethical standards of the profession."]; *McGonagle* v. *Union Fidelity Corp.* (1989) 383 Pa.Super. 223 [556 A.2d 878, 885] [suggesting that if plaintiff, general counsel to an insurance company allegedly terminated for refusing to approve the sale of policies on the ground that they failed to comply with state law, could point to a " 'specific' expression of public policy violated by his discharge," it would qualify as "wrongful and within the sphere of public policy," and noting that an "employee who is also a professional has a dual obligation: to abide by [the positive] law in addition to staying within the bounds of [the] professional code of ethics. Such responsibility may necessitate that the professional forego the performance of an act required by [the] employer."]; *Pierce* v. *Ortho Pharmaceutical Corp.* (1980) 84 N.J. 58 [417 A.2d 505, 512, 12 A.L.R.4th 520] [noting that "[e]mployees who are professionals owe a special duty to abide not only by federal and state law, but also by the recognized codes of ethics of their professions. That duty may oblige them to decline to perform acts required by their employers . . .", and, "[i]n certain instances, a professional code of ethics may contain an expression of public policy."]; see also *Lowry* v. *State Bd. of Indus. Ins. Appeals* (1984) 102

Wn.2d 58 [684 P.2d 678] [upholding state industrial appeals judge's refusal to permit lay representation in contested hearing on the ground that plaintiff had a good faith belief that to do so would result in a violation of governing professional ethics].)

In addition, the emphasis by the *Balla*, *Herbster* and *Willy* courts on the "remedy" of the in-house attorney's duty of "withdrawal" strikes us as illusory. Courts do not require nonlawyer employees to quietly surrender their jobs rather than "go along" with an employer's unlawful demands. Indeed, the retaliatory discharge tort claim is designed to encourage and support precisely the *opposite* reaction. Why, then, did the courts in these three cases content themselves with the bland announcement that the only "choice" of an attorney confronted with an employer's demand that he violate his professional oath by committing, say, a criminal act, is to voluntarily withdraw from employment, a course fraught with the possibility of economic catastrophe and professional banishment?

Whatever the reason, the withdrawal "remedy" fails to confront seriously the extraordinarily high cost that resignation entails. More importantly, it is virtually certain that, without the prospect of limited judicial access, in-house attorneys—especially those in mid-career who occupy senior positions—confronted with the dilemma of choosing between adhering to professional ethical norms and surrendering to the employer's unethical demands will almost always find silence the better part of valor. Declining to provide a limited remedy under defined circumstances will thus almost certainly foster a degradation of in-house counsel's professional stature.

E

In addition to retaliatory discharge claims founded on allegations that an in-house attorney was terminated for refusing to violate a mandatory ethical duty embodied in the Rules of Professional Conduct, judicial access ought logically extend to those limited circumstances in which in-house counsel's *nonattorney* colleagues would be permitted to pursue a retaliatory discharge claim *and* governing professional rules or statutes expressly remove the requirement of attorney confidentiality. Thus, in determining whether an in-house attorney has a retaliatory discharge claim against his or her employer, a court must first ask whether the attorney was discharged for following a mandatory ethical obligation prescribed by professional rule or statute. If, for example, in-house counsel is asked to commit a crime, or to engage in an act of moral turpitude that would subject him to disbarment (see, e.g., Bus. & Prof. Code, §§ 6101, 6106 [providing, respectively, for disbarment on conviction of a felony or a misdemeanor involving moral

turpitude, and for the "commission of any act involving moral turpitude, dishonesty or corruption"]), and is discharged for refusing to engage in such an act, counsel would have been discharged for adhering to a mandatory ethical obligation; under most circumstances, the attorney would have a retaliatory discharge cause of action against the employer.

If, on the other hand, the conduct in which the attorney has engaged is merely ethically *permissible*, but not *required* by statute or ethical code, then the inquiry facing the court is slightly more complex. Under these circumstances, a court must resolve *two* questions: First, whether the employer's conduct is of the kind that would give rise to a retaliatory discharge action by a *non*attorney employee under *Gantt* v. *Sentry Insurance, supra*, 1 Cal.4th 1083, and related cases; second, the court must determine whether some statute or ethical rule, such as the statutory exceptions to the attorney-client privilege codified in the Evidence Code (see *id.*, §§ 956-958) specifically permits the attorney to depart from the usual requirement of confidentiality with respect to the client-employer and engage in the "nonfiduciary" conduct for which he was terminated.

 We emphasize the limited scope of our conclusion that in-house counsel may state a cause of action in tort for retaliatory discharge. The lawyer's high duty of fidelity to the interests of the client work against a tort remedy that is coextensive with that available to the nonattorney employee. Although claims by in-house attorneys are cognate to those we approved in *Foley, supra*, 47 Cal.3d 654, the underlying rationale differs somewhat, being grounded in the attorney's obligation to adhere to ethical norms specific to the profession. The cause of action is thus one designed to support in-house counsel in remaining faithful to those fundamental public policies reflected in the governing ethical code when carrying out professional assignments. Thus, in addition to the limitations on the scope of the retaliatory tort action mentioned above, the concerns expressed by the courts in *Balla, supra*, 584 N.E.2d 104, and *Herbster, supra*, 501 N.E.2d 343, for the integrity of the fiduciary aspects of the attorney-client relationship impose additional limitations.

First, those values that underlie the professional relationship—the fiduciary qualities of mutual trust and confidence—can be protected from the threat of damage by limiting judicial access to claims grounded in *explicit* and *unequivocal ethical norms* embodied in the Rules of Professional Responsibility and *statutes*, and claims which are maintainable by the *non*attorney employee under our decision in *Gantt* v. *Sentry Insurance, supra*, 1 Cal.4th 1083, under circumstances in which the Legislature has manifested a judgment that the principle of professional confidentiality *does not apply*.

(See, e.g., Evid. Code, § 956.5 ["*There is no privilege* . . . if the lawyer reasonably believes that disclosure of any confidential communication . . . is necessary to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or substantial bodily harm." [Italics added].])[6]

Similarly, the in-house attorney who publicly exposes the client's secrets will usually find no sanctuary in the courts. Except in those rare instances when disclosure is explicitly permitted or mandated by an ethics code provision or statute, it is never the business of the lawyer to disclose publicly the secrets of the client. In any event, where the elements of a wrongful discharge in violation of fundamental public policy claim cannot, for reasons peculiar to the particular case, be fully established without breaching the attorney-client privilege, the suit must be dismissed in the interest of preserving the privilege. We underline the fact that such drastic action will seldom if ever be appropriate at the demurrer stage of litigation. Although General Dynamics argues that Rose's claims are barred from disclosure by the lawyer-client privilege, that is an issue that is incapable of resolution in a challenge to the facial sufficiency of the complaint. Indeed, in most wrongful termination suits brought by discharged in-house counsel, whether the attorney-client privilege precludes the plaintiff from recovery will not be resolvable at the demurrer stage. Rather, in the usual case, whether the privilege serves as a bar to the plaintiff's recovery will be litigated and determined in the context of motions for protective orders or to compel further discovery responses, as well as at the time of a motion for summary judgment.

Second, the contours of the statutory attorney-client privilege should continue to be strictly observed. We reject any suggestion that the scope of the privilege should be diluted in the context of in-house counsel and their corporate clients. Members of corporate legal departments are as fully subject to the demands of the privilege as their outside colleagues. It is likely, however, that many of the cases in which in-house counsel is faced with an ethical dilemma will lie outside the scope of the statutory privilege.

---

[6]As our discussion makes evident, in California, these ethical prescriptions are those embodied in the state's Rules of Professional Conduct and certain provisions of the Business and Professions Code (e.g., §§ 6068, 6090.5-6107). We expressly decline to adopt as a predicate for retaliatory discharge claims by in-house counsel either the Model Rules of Professional Conduct or the Model Code of Professional Responsibility, both of which have "no legal force of their own" (1 Hazard & Hodes, The Law of Lawyering, *supra*, § 206, at p. lxx) and neither of which has been adopted by this court. Although the question is not before us in this case, we suggest that ethical issues arising in retaliatory discharge claims filed in California by out-of-state in-house attorneys against their employers and based on extrastate conduct will be resolved under governing choice-of-law rules.

Matters involving the commission of a crime or a fraud, or circumstances in which the attorney reasonably believes that disclosure is necessary to prevent the commission of a criminal act likely to result in death or substantial bodily harm, are statutory and well-recognized exceptions to the attorney-client privilege. (See, e.g., *Marc Rich & Co.* v. *United States* (2d Cir. 1984) 731 F.2d 1032; *People* v. *Pic'l* (1981) 114 Cal.App.3d 824 [171 Cal.Rptr. 106]; *Glade* v. *Superior Court* (1978) 76 Cal.App.3d 738 [143 Cal.Rptr. 119]; Evid. Code, §§ 956-958.) As to them, "[t]he privilege takes flight if the relation is abused." (*Clark* v. *United States* (1933) 289 U.S. 1, 15 [77 L.Ed. 993, 1000-1001, 53 S.Ct. 465] (opn. of Cardozo, J.).) Although their revelation in the course of a retaliatory discharge suit may do lasting damage to the expectations of the corporate client (or, more likely, a corporate executive) that disclosures to counsel would remain inviolate, a concern for protecting the fiduciary aspects of the relationship in the case of a client who confides in counsel for the purpose of planning a crime or practicing a fraud is misplaced; such disclosures do not violate the privilege.

■ Moreover, the trial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege. The use of sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings, are but some of a number of measures that might usefully be explored by the trial courts as circumstances warrant. We are confident that by taking an aggressive managerial role, judges can minimize the dangers to the legitimate privilege interests the trial of such cases may present.

■ Finally, a handful of subsidiary rules will effectively raise the ante on the in-house attorney contemplating a tort action, thus deterring the incidence of strike suits or claims filed in bad faith. The contested ethical requirement must be clearly established by the ethics code or statutory provision; disagreements over policy are *not* actionable. The plaintiff, of course, bears the burden of establishing the *unequivocal* requirements of the ethical norm at issue and that the employer's conduct was motivated by impermissible considerations under a "but for" standard of causation. The ethical norm at issue must be one that is intended for the protection of the public at large; measures designed solely for the benefit of the attorney or the client will not suffice to support a retaliatory discharge claim. Moreover, an attorney who unsuccessfully pursues a retaliatory discharge suit, and in doing so discloses privileged client confidences, may be subject to State Bar disciplinary proceedings. (See, e:g. *Dixon* v. *State Bar* (1982) 32 Cal.3d 728, 739 [187 Cal.Rptr. 30, 653 P.2d 321]; Bus. & Prof. Code, § 6068, subd. (e).)

Finally, of course, the defendant employer is always free to challenge plaintiff's claim by demonstrating the discharge was motivated by reasons other than a demand that counsel engage in conduct amounting to a breach of professional ethical norms.

## VI

 Applying the principles developed above to the complaint in this case, it is evident that as noted, *ante*, at page 1178, plaintiff's first claim—for breach of an implied-in-fact just-cause agreement—adequately pleads the essential elements of the cause of action. It is less clear, however, that the allegations in support of relief under plaintiff's retaliatory discharge theory are sufficient. Plaintiff nowhere alleges that the conduct which allegedly led to his termination was required or supported by any requirement of our Rules of Professional Conduct or a relevant statute. This omission is not surprising, however, in light of the fact that no court of this state has previously addressed the precise question presented by this case in a published opinion. In drawing up the complaint, plaintiff apparently proceeded on the assumption that the scope of retaliatory discharge claims by in-house counsel is coextensive with that of other corporate employees. We have, of course, concluded that that view is too expansive.

In light of our ruling, we believe the fairest resolution is to direct that the matter be remanded to the trial court and that plaintiff be permitted to amend his complaint against General Dynamics in accordance with the views we have expressed. It should go without saying that nothing we have said is intended to intimate in any way a view of the merits of this action.

### CONCLUSION

The judgment of the Court of Appeal is affirmed and the cause is remanded to that court with directions to order further proceedings in accordance with the views expressed herein.

Lucas, C. J., Mosk, J., Kennard, J., Baxter, J., George, J., and Turner, J.,* concurred.

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Acting Chairperson of the Judicial Council.